# JASELLI *v.* RIGGS NATIONAL BANK.

POSTAL MONEY ORDERS; STATUTES; NEGOTIABLE INSTRUMENTS; BANKS AND BANKING; DILIGENCE; CHECKS; FRAUD; QUESTIONS FOR JURY.

1. Postal orders are not negotiable paper.
2. The money order system is popular and largely patronized by the public because of its simplicity. Technical rules and requirements that add nothing to the safety of the service or the protection of the public should be discouraged, as they tend to lessen its popularity in proportion as they increase its complexity.
3. U. S. Rev. Stat. sec. 4037, U. S. Comp. Stat. 1901, p. 2747, which provides that "the payee of a money order may, by his written indorsement thereon, direct it to be paid to any other person," etc., does not require that the indorsement shall be by the hand of the payee, but the statute is satisfied if the payee directs another to indorse his name on the order.
4. A bank may arbitrarily select its customers, and its act in declining an account is not open to question. But once it accepts an account, the depositor *eo instanti* becomes its customer, and entitled as such to have his checks honored to the extent of his credits, until the relationship is terminated by the act of either or both of the parties.
5. Where a bank without sufficient justification refuses to pay the check of a customer, he has an action for the impeachment of his credit.
6. A bank is not justified in closing an account and dishonoring checks drawn against it, without reasonable notice.
7. While a bank, upon notice that a third party claims to be the real owner of money deposited with it in a customer's account, after satisfying itself that the claim is made in good faith, that is, that there is some real foundation or justification for it, would have the right to retain out of the deposit a sum sufficient to meet such claim, it must exercise diligence in notifying its customer of the adverse claim, and of its intention to protect itself by retaining out of the amount standing to his credit a sum sufficient to meet the claim; and negligence in that regard, resulting in injury to its depositor, will render the bank liable.
8. As to checks already drawn by a customer before he is notified of an adverse claim to his deposit, the bank acts at its peril when it dishonors them.

9. A bank accepted from a depositor postal money orders indorsed in blank by the payee, a person other than the depositor, credited them to the depositor's account, and collected the proceeds from the postal authorities. About a year and a half later, a postal inspector notified the bank that the signatures of the payee were not genuine, and that it would have to refund the money, and thereafter caused the orders to be sent to the bank through the clearing house, whereupon the bank paid them, charging their amount to the depositor's account, and the inspector paid the money so collected to the payee. After the notice from the inspector, the bank ascertained by telephone to the local address of the depositor, that he was not there. Later it wrote him, by letter addressed to the local postoffice, requesting him to call, but at, that time the depositor was in Baltimore, from which place he had theretofore sent a deposit to the bank, and he failed to receive the letter. The bank made no effort to obtain the depositor's address from the inspector. In actions by the depositor against the bank for refusing to honor his checks on the ground of insufficient funds on deposit, there was evidence tending to show that the payee of the money orders had authorized a third person to indorse them. *Held* that (1) it was a question for the jury whether such authority had been given by the payee, and also that (2) it was a question for the jury whether the bank had been diligent in notifying the depositor of the adverse claim upon the deposit in question.

10. Under sec. 1006 of the Postal Regulations of 1902, the Postoffice Department disclaims any responsibility after a money order has once been paid, "but in case of wrong payment, it will endeavor to recover the amount for the owner, provided such wrong payment was not brought about through the fault of the remitter, payee, or indorsee."

11. Fraud may not be assumed, but must be proved.

12. Where a bank, upon an adverse claim having been made to certain money deposited by one of its customers in his own account, pays the claimant the amount of his claim out of the funds standing to the credit of its customer, and charges against the customer the amount thus paid, the customer has an action against the bank for the amount thus appropriated, without previous demand.

13. Where a dispute exists between a bank and a depositor as to the balance to his credit, and the depositor withdraws by check the balance admitted by the bank to be due him, and afterwards draws a check for the disputed amount, which is dishonored by the bank, he has no right of action against the bank for injury to his credit because of the bank's refusal to pay the check, although he may have the right in a proper action to recover the disputed amount from the bank.

Nos. 2182 and 2183. Submitted November 4, 1910. Decided January 3, 1911.

HEARING on two appeals by the plaintiff from judgments of the Supreme Court of the District of Columbia upon verdicts directed by the court in actions for damages for the alleged dishonor of checks drawn by the plaintiff upon the defendant. *One judgment affirmed and the other reversed.*

The COURT in the opinion stated the facts as follows:

These are appeals from judgments of the supreme court of the District of Columbia upon directed verdicts in two actions in case against the Riggs National Bank, appellee here, for damages ensuing from the dishonor of two checks drawn by the plaintiff, appellant here, upon said bank. By agreement the cases were consolidated for trial.

The plaintiff, Emilio Jaselli, in 1903, opened an account with the defendant, and between that time and the date of the occurrences leading up to this litigation his total deposits amounted to about $10,000. At the time he opened his account and up to October, 1906, he was employed at the New Willard Hotel in this city, which was the only address he ever gave the bank. He then went to Baltimore, and was employed as a steward in Kernan's Hotel, in which employment he continued until December, 1907. The last deposit he made with the defendant was a personal check on the Howard National Bank of Baltimore on March 26th, 1907. This check was deposited for collection. On September 22d, 1905, the plaintiff deposited postal money orders aggregating $1,683.75. Four of these orders were payable to the order of Nicola Jaselli, a brother of the plaintiff, and amounted to $336.71. These four orders purported to have been indorsed in blank by said Nicola Jaselli. Above the indorsements plaintiff himself had written the words, "Order of Emilio Jaselli." The bank accepted all the orders and credited the plaintiff's account with their aggregate amount. In due course they were paid by the postal authorities. On the

26th of April, 1907, said Nicola Jaselli lodged a complaint with the Postoffice Department to the effect that the orders payable to him had been cashed without his knowledge or authority.    Thereupon a postoffice inspector was detailed to investigate the case, and he soon thereafter called at the Riggs Bank and interviewed its cashier, notified him that the signature on the orders was not the signature of Nicola Jaselli, and that the bank would have to refund the money.    The cashier immediately notified the bookkeeper and teller of the bank to pay no more checks of Emilio Jaselli without reference to the cashier.    Thereupon, the cashier telephoned the New Willard Hotel,—the address given by the plaintiff,—but, of course, did not find him there.    The bank then wrote a letter to Emilio, addressed to Washington, District of Columbia, asking him to call.    This letter did not reach the plaintiff, who, as above noted, was at that time a resident of Baltimore.    No further effort was made by the bank to locate or reach the plaintiff. The postoffice inspector, on the 15th of May, 1907, obtained an affidavit from said Nicola Jaselli in which affiant stated that when he left Italy in June, 1904, he knew "that there was some money coming to members of my family, and *possibly* myself, from an estate of a deceased uncle."    The word "possibly" was interlined, whether before or after signing does not appear except by inference.    Affiant further stated "that the signatures of Nicola Jaselli as they appear on the orders were not written by myself or by my authority, and same are forgeries.    I recognize the handwriting as that of either Edward Jaselli or Emilio Jaselli, my brother, who, as I have been informed, is now employed at Kernan's Hotel in the city of Baltimore, Maryland.    *   *   *   I knew that some money had been received from Italy from my uncle's estate soon after it arrived in September, 1905, but supposed it all came to my father, Georgio Jaselli, and never knew that part of it was for me until about twenty days ago, as hereinbefore stated." The postoffice inspector, with this affidavit in his possession, again interviewed the cashier of the bank.    At the time of this interview he had ascertained definitely that plaintiff was

employed at said Kernan's Hotel in Baltimore. He did not,
however, inform the bank officials of this fact, nor did they
inquire of him concerning the whereabouts of their depositor
Emilio; nor does it appear that they ever sought any informa-
tion concerning the evidence in support of said adverse claim.
Failing to bring about the repayment by the bank of these
orders, the postoffice inspector caused them to be sent through
the clearing house on the 18th of May, obtained the money on
them without further protest from the bank, and, on May 20th,
the money was paid over to said Nicola Jaselli. On said 20th
of May the bank charged the aggregate amount of these orders,
$336.71, to said Emilio's account. On May 21st plaintiff came
to Washington from Baltimore, and gave his attorney, to whom
he was indebted in the sum of $100, a check for $800 on the
defendant bank, the difference between the $800 and the $100
was, of course, to have been paid over to the plaintiff, who tes-
tified that he was in need of money. At that time, according
to the plaintiff's contention, there should have been to his credit
in the bank something over $820; according to the defendant's
contention there was $485.47. In other words, plaintiff con-
tends that the bank was without authority to charge his account
with the amount of the Nicola Jaselli orders, and the defendant
insists that it possessed such authority. Plaintiff's attorney
immediately presented this $800 check for payment, and its
payment was refused by the paying teller on the ground that
there were insufficient funds of the plaintiff on deposit to meet
it. The attorney was referred to the cashier, who, upon being
asked what was the matter with the check, replied "not suf-
ficient funds here." The cashier declined to make a further
explanation, and inquired for the plaintiff. Whereupon his
attorney telephoned for him, and he immediately responded to
the call. There is some dispute as to just what occurred when
the plaintiff reached the bank, but it clearly appears that he
was asked by the cashier, who signed the orders, and that, act-
ing upon the advice of his attorney, he declined to state. The
cashier admitted in the course of his testimony that he informed
the plaintiff during the interview that the bank had been com-

pelled to refund the· money to the postal authorities, and that it had charged plaintiff's account with the amount. That he, the cashier, offered the orders to plaintiff, which plaintiff declined to receive. There is evidence on behalf of the plaintiff tending to show that the cashier was informed that it would be proven that the orders were signed by an agent of Nicola. It is·undisputed that the bank continued to refuse to honor·said check. During the interview between the bank officials and the plaintiff and his counsel, the bank, in pursuance of a prior understanding with the postoffice inspector, telephoned that official; who immediately appeared upon the scene for the purpose ·of effecting the arrest of the plaintiff. Having no warrant, the inspector did not carry out his intent. After the bank had declined to honor the $800 check, Emilio, upon the same occasion, asked for his balance. Whereupon the paying teller consulted the ledger, and imparted the desired information to Emilio, who immediately drew a check for the exact amount, $485.47. This check was cashed before plaintiff left the bank. The first suit against the bank was filed on May 23d, 1907. It developed upon the trial under review that a trial was had upon this first suit, but that the verdict was set aside. Prior to the setting aside of said verdict, namely, on January 18th, 1908, plaintiff gave a second check on the defendant bank to Dr. Charles Beall for $55. This check was duly presented for payment by Dr. Beall, and payment refused. Thereupon, on January 31st, 1908,·a second suit based upon the dishonor of said check of January 18th, 1908, was filed.

Upon the trial of the consolidated cases, the plaintiff introduced as witnesses Edward Jaselli, his brother, his sister Elizabeth, and his mother, who testified in substance that about two weeks before the money orders in controversy arrived, the plaintiff, said Nicola Jaselli, and said witnesses were present at the family home, 2011 H street; that reference was made to a letter written by a sister, Theopista, who lived in Philadelphia, authorizing said Elizabeth to sign Theopista's money. orders when they came, because Theopista could not come to Washington to sign them herself; that thereupon Nicola said to Edward,

"I want you to sign for me;" that Nicola did not live with the family, and stated as his reason for wanting Edward to sign for him, that he wouldn't have time to attend to the matter himself or wouldn't be "on hand," or something to that effect; that when the money orders came, two weeks thereafter, Edward signed Nicola's name without attempting to imitate his signature, and that Emilio wrote over the name as thus signed the words, "Order of Emilio Jaselli." Edward testified further that the next day after the money came he saw Nicola and informed him "that the money had arrived." The sister Theopista also testified that she had talked with Nicola about the matter both before and after the money came.

Nicola, although summoned by the defendant, did not appear as a witness. In the course of the trial it developed that the bank, after the bringing of the two suits, and to prevent others being brought, and thus, as it contended, injure its credit, paid plaintiff the amount of the disputed orders. We think the foregoing a sufficient statement of the facts as developed by the testimony introduced by each of the parties.

At the close of all the evidence the learned trial justice ruled that the provision in sec. 4037, Rev. Stat. U. S. Comp. Stat. 1901, p. 2747, allowing the payee of a money order "by his written indorsement thereon," to "direct it to be paid to any other person," means an indorsement *by the hand* of the payee, and hence that, even assuming the facts as to the indorsement of the orders in question to be as contended by the plaintiff, a species of fraud was practised upon the bank which entitled it, upon discovering that the indorsement had not been made by the hand of the payee, but merely by his oral authorization, to rescind the transaction, and charge off its books the credit it had given the plaintiff. Over the objection and exception of the plaintiff, verdicts in each of the cases were directed accordingly.

*Mr. J. H. Ralston, Mr. F. L. Siddons, Mr. W. E. Richardson,* and *Mr. H. Winship Wheatley* for the appellant.

*Mr. R. Ross Perry, Mr. R. Ross Perry, Jr.,* and *Mr. A. S. Worthington* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

We will first determine whether said provision in said section demands the literal interpretation given it by the learned trial justice. The section reads:

"The payee of a money order may, by his written indorsement thereon, direct it to be paid to any other person, and the postmaster on whom it is drawn shall pay the same to the person thus designated, provided he shall furnish such proof as the Postmaster General may prescribe that the indorsement is genuine, and that he is the person empowered to receive payment; but more than one indorsement shall render an order invalid, and not payable, and the holder, to obtain payment, must apply in writing to the Postmaster General for a new order in lieu thereof, returning the original order, and making such proof of the genuineness of the indorsements as the Postmaster General may require."

In the determination of this question, the nature of these money orders must be kept in mind. They are not, as suggested by the learned counsel for appellee, negotiable paper (*United States v. Stockgrowers Nat. Bank,* 30 Fed. 912), so that the rules applicable to that kind of paper are not controlling here. In the above cited case the opinion was written by Circuit Judge Brewer, subsequently Mr. Justice Brewer of the Supreme Court of the United States. If these orders were negotiable paper, it might be argued with much force that the statute contemplates a personal indorsement by the payee, that is, an indorsement by his own hand. The money order service is merely an incident of the postal system, and was inaugurated to enable the citizen to transmit safely through the mails small sums. *United States v. Bolognesi,* 164 Fed. 159. The statute in terms provides that more than one indorsement renders an order invalid, and, necessarily, whoever takes one is charged with knowledge of that fact. If an order is presented to a

postoffice for payment, the postmaster naturally requires the person presenting it to establish his identity; and if any doubt is entertained as to the right of an indorsee to receive payment, further proof as to the genuineness of the indorsement is required. It would be no more difficult for the wrongful holder of an order to deceive the postmaster, should it be held that the indorsement must be by the hand of the payee, than would it be under a holding that indorsement may be by the authorization of the payee, and in either case the person who wrongfully indorsed the name of the payee would be guilty of forgery. There is, therefore, no apparent reason for giving the statute the strict construction contended for by appellee. On the other hand, on both reason and authority, we think it should be given a more liberal interpretation. The money order system is popular and largely patronized by the public because of its simplicity. Technical rules and requirements that add nothing to the safety of the service or the protection of the public should be discouraged, as they tend to lessen its popularity in proportion as they increase its complexity.

In the case of *State* v. *Holmes,* 56 Iowa, 588, 41 Am. Rep. 121, 9 N. W. 894, the court had under consideration a provision of the Iowa Code as to the holding of terms of circuit courts, as follows: "If the judge is sick, or for any other sufficient cause is unable to attend court at the regularly appointed time, he may *by a written order* direct an adjournment to a particular day therein specified, and the clerk shall, on the first day of the term, or as soon thereafter as he receives the order, adjourn the court as therein directed." A judge, not being able to be present, telegraphed the clerk on the first day of the term, "I have made and sent you a written order adjourning court until to-morrow morning at 9 o'clock. Adjourn it accordingly." The clerk acted as directed, and the following day received the formal order. In its opinion the supreme court said: "The only question, then, is whether the telegram is a written order as contemplated by the statute, and its sufficiency. Contracts may be made by telegram, even where it is required they must be in writing, and it has been said, it makes no dif-

ference if the writing is done with a steel pen, an inch long, attached to an ordinary penholder, or whether the pen be a copper wire 1,000 miles long. *Howley* v. *Whipple,* 48 N. H. 487; *Trevor* v. *Wood,* 36 N. Y. 307, 93 Am. Dec. 511. The telegraph operator was the agent of the judge, and by means of the wire, and instruments attached thereto, and the operator, the judge wrote the telegram, which was directed to the clerk. We think it was a written order within the meaning of the statute."

. A Vermont statute provided that the sheriff might depute any proper person to serve a writ or other precept by *indorsing thereon* a special deputation. The supreme court of Vermont ruled: "Although 'to indorse' means 'to write on the back of' yet it is not necessary under this statute that the deputation should be written upon the very fabric of the process itself. It may be written on any other piece of paper and attached to the back of the process by the sheriff, or *he may in certain circumstances authorize another to attach it for him.*" In commenting on the facts of the case under consideration, the court said: "Indeed, it [the deputation] was put there by him [the sheriff] in the eye of the law; he performed the act by another as his instrument, and the requirement of the statute was fulfilled." *Cowdery* v. *Johnson,* 60 Vt. 595, 15 Atl. 188.

In the present case we think the requirement of the statute is satisfied if the payee directs another to indorse his name on the order. It is none the less the payee's indorsement because another has been his instrument.

A bank may arbitrarily select its customers, and its act in declining an account is not open to question. But once it accepts an account, the depositor *eo instanti* becomes its customer, and entitled as such to have his checks honored to the extent of his credits, until the relationship is terminated by the act of either or both of the parties. Of course, the relationship cannot be abruptly terminated without regard to existing liens and the rights of the parties. Morse, Banks & Bkg. 4th ed. sec. 178; 5 Cyc. Law & Proc. p. 513. And where the bank, without suf-

ficient justification, refuses to pay the check of its customer, he has an action for the impeachment of his credit.

It is well settled that a bank is not justified in closing an account and dishonoring checks drawn against it without reasonable notice. The reason is obvious. The depositor is entitled to sufficient notice to enable him, in the exercise of reasonable diligence, to protect his credit. Hart, Bkg. p. 220. The bank will not be permitted to set up as against its depositor the interests of a third party. "It is clearly against public policy to permit a bank that has received money from a depositor, credited him therewith upon its books, and thereby entered into an implied contract to honor his checks, to allege that the money deposited belongs to someone else. This may be done by an attaching creditor, or by the true owner of the fund; but the bank is estopped by its own act." *First Nat. Bank* v. *Mason,* 95 Pa. 113, 40 Am. Rep. 632.

In England the rule seems to be that a mere notice from a third party that he claims the balance standing to the credit of the customer will not justify the bank in dishonoring a check. Hart, Bkg. p. 301; *Tassell* v. *Cooper,* 9 C. B. 509. In this country, however, there is authority for the proposition that where notice is given the bank that the money standing to the depositor's credit belongs to another, the bank will be justified in withholding payment of the deposited amount. *First Nat. Bank* v. *Bache,* 71 Pa. 213; *Arnold* v. *Macungie Sav. Bank,* 71 Pa. 287; *McEwen* v. *Davis,* 39 Ind. 109; Zane, Banks & Bkg. ¶ 134; Morse, Banks & Bkg. 4th ed. ¶ 342. Of course, the bank is always protected when the deposit is attached or garnished. *Citizens' Nat. Bank* v. *Alexander,* 120 Pa. 476, 14 Atl. 402. Mr. Morse suggests (¶ 342b) that if the bank *"has reason to believe"* that the claim adverse to the depositor is well founded," it should bring a bill of interpleader, and cites authorities to sustain the proposition. Mr. Zane concurs in this view (¶ 134), and adds that whenever there is a dispute as to the ownership of a deposit, the bank in essaying to settle it acts at its peril.

In the light of the foregoing what was the duty of the bank

to the plaintiff when it received notice, early in May, that Nicola Jaselli had asserted a claim adverse to its customer? The bank was, of course, charged with knowledge that the payment of these orders had occurred almost two years previously, and that presumptively the transaction was regular, and the deposit the property of its depositor, the plaintiff. What action did the bank take? It very promptly proceeded to protect itself by notifying its paying teller to honor no checks of the plaintiff until directed to do so by its cashier. It then telephoned to the New Willard Hotel and immediately learned that the plaintiff was no longer employed there. With that knowledge, and the knowledge that the plaintiff, in March, previously, had deposited a personal check on the Howard National Bank of Baltimore, it addressed a letter to Washington, District of Columbia, asking plaintiff to call. The bank made no effort whatever to interview the adverse claimant of these orders, who knew his brother's address, nor did it take the trouble to inquire of the postoffice inspector concerning the whereabouts of the plaintiff, although that official had definite information as to the address of the plaintiff upon the second, if not the first, of his several interviews with the bank officials. While we are of the opinion that the bank upon notice of this adverse claim, after satisfying itself that the claim was made in good faith,— that is, that there was *some* real foundation or justification for it,—would have had the right to retain out of the plaintiff's deposit a sum sufficient to meet such claim (*Arnold* v. *Macungie Sav. Bank,* 71 Pa. 287; *McEwen* v. *Davis,* 39 Ind. 109), we think, nevertheless, a similar duty devolves upon the bank in such a situation as devolves upon it in closing an account. It must exercise diligence in notifying its customer of the adverse claim, and of its intention to protect itself by retaining out of the amount standing to his credit a sum sufficient to meet that claim; and negligence in that regard, resulting in injury to its depositor, will render the bank liable. Certainly the bank is not justified, upon the notice of a third party, in dishonoring its customer's checks, unless it has exercised diligence in notifying him of its intention to do so, or, of course,

unless it subsequently develops that the deposit had been wrongfully acquired and was in fact the property of the third party. As to those checks already drawn before notice of the adverse claim, the bank acts at its peril when it dishonors them. In such a situation justice would seem to require that the bank be given sufficient time to ascertain by *diligent* inquiry whether the adverse claim is well founded; but justice also would seem to demand that in the meantime those checks be not dishonored. Conceding that the position of the bank is a delicate one, the rights of the customer must not be lost to view. If his checks are dishonored without justification, that is, if the adverse claim proves to be unfounded, a grievous injury is done him. Public policy therefore demands that the bank act with diligence and in perfect good faith. The question last suggested is not involved in this case, however, for the reason that the $800 check was not given until many days after the bank had notice of the adverse claim.

We think, therefore, that it was clearly a question for the jury, under proper instruction from the court, whether the bank, taking into consideration the facts and surrounding circumstances as disclosed by the evidence, was justified in protecting itself from this adverse claim, and whether it performed its whole duty to the plaintiff in the matter of notice.

It was also a question for the jury to determine whether Nicola Jaselli authorized the indorsement of these orders as contended by the plaintiff.

Even assuming that the learned trial justice was correct in his view of sec. 4037, Rev. Stat. U. S. Comp. Stat. 1901, p. 2747, it by no means follows that the plaintiff would not have a right of recovery. If the jury should find that the payee of the orders, Nicola Jaselli, authorized indorsement thereof as contended by the plaintiff, the payment of these orders was, at most, a mere irregularity. The only person affected thereby was Nicola Jaselli. Obviously an action by him against the bank would fail, because he, having been responsible for the irregularity, could not take advantage of it. Surely the bank cannot be in any more favorable position in respect to these

orders than the payee, Nicola Jaselli. If his contention of ownership fails, the bank's justification must also fail, unless the jury should find that it had reason to believe his claim well founded, and that it exercised diligence in notifying its customer. Under sec. 1006 of the Postal Regulations of 1902, the Postoffice Department disclaims any responsibility after a money order has once been paid, "but in case of wrong payment it will endeavor to recover the amount for the owner, provided such wrong payment was not brought about *through the fault of the remitter, payee, or indorsee."* Under the assumed facts, therefore, the postal authorities were violating their own regulations.

Should it be established that the indorsement upon the orders in question was a forged indorsement, the right of the bank, upon discovering the fraud, to rescind the transaction and charge off its books the credit given, is not open to question. *Flatow* v. *Jefferson Bank,* 135 App. Div. 24, 119 N. Y. Supp. 861. In such a situation the bank would be liable to the true owner of the orders. But fraud may not be assumed. It must be proved, and the question must be determined by the jury.

Counsel for the appellee contend that the conduct of the plaintiff during his interview with its officials was such as to warrant the bank in refusing to honor his check. The bank at that time had refused payment of the check and assigned as its reason lack of funds to the credit of the plaintiff. It had done much more. It had undertaken to settle the controversy between him and the claimant of the fund, had paid that claimant the amount of his claim out of the funds standing to the credit of its customer, and had charged against the customer the amount thus paid. Under the authorities, plaintiff would have had an action against the bank for the amount thus appropriated, without previous demand upon the bank. *Farmers' & M. Bank* v. *Planters' Bank,* 10 Gill & J. 442; *Bank of Missouri* v. *Benoist,* 10 Mo. 519; *Heard* v. *Lodge,* 20 Pick. 53, 32 Am. Dec. 197; *Miller* v. *Western Nat. Bank,* 172 Pa. 197, 33 Atl. 684. The cashier of the bank informed the plaintiff that the bank had summarily taken from his account the amount of

these orders and paid that amount to Nicola. More than this, the bank had already arranged with the postoffice inspector to notify him when its customer appeared, in order that the inspector, to use the language attributed to him by the bank's customer, might "get" the plaintiff. This arrangement it faithfully carried out. In the light of these facts, it is not surprising that counsel for the plaintiff should have advised his client against furnishing the bank with any further information. The bank certainly is in no position to complain because he did not, for it is evident that the bank sought evidence to discredit him, and not evidence in his favor. It had resolved every doubt against him, and nothing he could have said would have changed the situation. Indeed, its learned counsel even now allude to the testimony of the plaintiff and his witnesses as a "most improbable story."

As to the second suit, the facts and the situation of the parties are materially different. At the time plaintiff drew the check forming the basis of this suit, he had made no deposit for nearly a year, and about seven months prior to the date of said check he had asked for his balance, that is, the balance shown by the books of the bank, and had thereupon withdrawn it. The plaintiff, therefore, temporarily at least, closed his account with the bank, arrested the relationship theretofore existing between them, and thereafter he had no reason to believe and no right to expect that the bank would honor checks drawn against the disputed amount. While he was not without remedy for the recovery of that amount, the right growing out of the relation which theretofore had existed between him and the bank to have his checks honored had ceased. In *King* v. *British Linen Co.* 1 Sc. Sess. Cas. 5th series, 928, the facts were briefly these: The bank, on the 22d of October, 1896, gave notice to a customer of its intention to retain the money at his credit pending settlement of a claim which the bank made against him. Thereafter, while there were sufficient funds to the customer's credit, the bank refused payment of a check drawn prior to, though not presented until after, the date of the notice. The lord president in the course of his opinion said:

"Then, if it be the case that at the date of the notice of 22d October, the bank had funds of this gentleman in their hands, there comes the question, What were their rights and obligations in regard to that account? Now, I take it that they were quite entitled to close the account, giving notice to their customer, and that they were quite entitled to say: 'From this date we cease to be your bankers; we decline to do more business with you.' But then that is only from the date of the notice reaching the customer, and the important point here is that prior to the issuing of this notice this customer had granted a check in the ordinary course of business. I say the bank could not by this notice absolve themselves from responsibilities that they had undertaken as bankers, and meeting this check was one of them. They were entitled to say, 'In future we will not honor them;' but they could not say, 'We decline to meet obligations you have incurred during the currency of our undertaking to supply such orders for money.' Therefore I hold that as matter of fact the bank were in the wrong in declining to meet this particular check when tendered." Lord Adam in discussing the case observed: "Had this check which was presented on 10th November been drawn by the pursuer after the date of that notice, I think that the bank would on that assumption have put an end to the relation of customer and banker, and would have been entitled to refuse payment of the check after the notice. But that is not the state of facts, because the check of which payment was refused was issued and dated 21st October,—the day before the notice was given by the bank. It seems to me that that notice necessarily applied only to checks issued after the withdrawal of the relation of customer and banker." The other justices concurred in these views.

It is clear that when this second check was drawn the plaintiff knew that the bank denied that it held any funds to the credit of his account. In other words, that as to this amount the bank had expressly repudiated the relationship existing between banker and customer, out of which arises the right of the customer to have his checks honored to the extent of his credits. Had the plaintiff, prior to the withdrawing of the balance ad-

mitted by the bank, drawn a check within the amount of that balance, and the bank had dishonored that check, an entirely different question would be presented; but having withdrawn all save the disputed amount, the drawing of the second check was with full knowledge of the consequences almost certain to ensue, and if his credit has suffered by reason of the dishonor of said check, he is, for the reasons stated, without redress.

The judgment must be reversed, with costs to the plaintiff in the first case, No. 2182, with directions to grant a new trial; the judgment in No. 2183 is affirmed, with costs to the defendant. *Affirmed as to No. 2182 and reversed as to No. 2183.*

A petition for a rehearing was denied.