**UNITED STATES of America**

v.

**The FIRST NATIONAL BANK OF BOSTON.**

**Civ. A. No. 65–596.**

United States District Court
D. Massachusetts.

Jan. 20, 1967.

Paul F. Markham, U. S. Atty., David M. Roseman, Asst. U. S. Atty., for plaintiff.

John J. Curtin Jr., Everett H. Parker, Bingham, Dana & Gould, Boston, Mass., for defendant.

## OPINION

WYZANSKI, Chief Judge.

This case, before the Court on cross-motions for summary judgment, presents on a statement of agreed facts and on un-contradicted affidavits the question whether when a stolen postal domestic money order, on which the initial of the issuing employee had been forged and on which there had been impressed the mark of a stolen postal dating stamp, is bought by a bona fide indorsee, and that indorsee has received payment from the United States, the United States may recover back its payment from the indorsee.

About March 24, 1964 one Joseph A. MacDonald stole from a post office, known as contract station no. 67, 63 postal domestic money order blanks of the type covered by 39 U.S.C. c. 83 and 39 C.F.R., Subchapter G, Part 61. June 23, 1964 he stole from a post office, known as contract station no. 127, an all-purpose dating stamp of the type referred to in C.F.R. 61.1(c) (2).

An all-purpose dating stamp shows the city, the postal station number, and the date.

The face of a blank postal domestic money order, so far as relevant, shows a serial number, such as 421,096,996, different for each order; a symbol $\frac{15-119}{000}$, uniform for all orders; a blank line following the words "PAY TO" to be filled in with the name of the person to whom the money order is payable; three blank lines following the word "FROM" to be filled in with the name and address of the purchaser; a blank for the "initial of issuing employee"; and a blank for the "issuing office stamp." On the back of such an order appears the following:

"PAYEE MUST ENDORSE BELOW ON LINE MARKED 'PAYEE'

OWNERSHIP OF THIS ORDER MAY BE TRANSFERRED TO ANOTHER PERSON OR FIRM IF THE PAYEE WILL WRITE THE NAME OF SUCH PERSON OR FIRM ON THE LINE MARKED 'PAY TO' BEFORE WRITING HIS OWN NAME ON THE SECOND LINE. MORE THAN ONE ENDORSEMENT IS PROHIBITED BY LAW. BANK STAMPS ARE NOT REGARDED AS ENDORSEMENTS.

PAY TO ————————————————————————————

THIS ORDER BECOMES INVALID AFTER 20 YEARS. THEREAFTER NO CLAIM FOR PAYMENT WILL BE CONSIDERED"

MacDonald upon the face of each of the 63 stolen money orders wrote after the words "PAY TO" the name "John A. McCarthy", filled in a fictitious name and address of a purchaser, inserted $100 as the amount payable, wrote a fictitious initial of a supposed issuing employee, and impressed the mark of the validating dating stamp stolen from contract station no. 127. Using the alias John A. McCarthy, MacDonald between June 29 and July 2, 1964 indorsed and cashed the 63 money orders at branches of The First National Bank.

The bank in good faith paid MacDonald, and on or before July 3, 1964 presented the money orders to the United States and was paid the full amount of $100 for each money order. Thereafter, the government notified the bank that the 63 money orders were on stolen blanks and had been validated by a stolen validating stamp. These were the first no-

tices the bank received of the theft of either the blanks or the stamp. The Court finds that the bank did not receive an earlier notice, mailed by the Post Office Department on March 25, 1964, that blank domestic money orders numbered 421,096,556 through 421,096,999 had been stolen. The presumption that a properly mailed letter was received has been rebutted by the evidence.

The government demanded the return of $6,300 and, upon the bank's refusal to pay, brought this action for $6,300 plus interest and costs.

■ This case is admittedly governed by federal statutory law and, where that is silent, by a judicially-fashioned Federal common law. United States v. Cambridge Trust Company, 1st Cir., 300 F.2d 76.

Neither the federal statutes nor the regulations of the Post Office address themselves directly to the effect of payment by the United States of a stolen postal domestic money order which has upon it a forgery of the initial of an issuing employee and an impress of a stolen all-purpose dating stamp. The following seem to be the only statutory or regulatory provisions which might be thought relevant to the question.

39 U.S.C. § 5102 provides that "(a) the Postmaster General shall cause money orders to be issued at such post offices, including stations and branches, as he designates." 39 U.S.C. § 5103(a) provides that "The Postmaster General shall provide for the payment of money orders to the payee, indorsee, or remitter at offices at which money orders are issued." 39 C.F.R. § 61.3(b) (1) provides that "A card money order [which is a form applicable to the 63 postal domestic money orders here involved] may be cashed at any post office or bank." 39 U.S.C. § 5104 provides that "The payee of a money order, by his written indorsement thereon, may direct it to be paid to any other person who shall be entitled to payment upon furnishing such proof as the Postmaster General requires that the indorsement is genuine, and that he is the person named therein. More than one in-

dorsement renders an order invalid. The holder of such an order, if otherwise entitled thereto, may obtain payment under such application and proof of the genuineness of the indorsements as the Postmaster General requires."

Defendant's broadest contention is that today the postal domestic money order, unlike its pre-1951 prototype, is a negotiable instrument within the meaning of the Uniform Commercial Code and that it is therefore proper to apply to it § 3–418 of the Code which provides that "payment * * * of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment", and which designedly "follows the rule of Price v. Neal, 3 Burr. 1354 (1762)." See Comment 1 to § 3–418.

■ There is difficulty in sustaining this broad contention. To be a negotiable instrument within the Uniform Commercial Code and within the laws of the 47 states which have adopted substantially all its provisions, a writing must "be payable to order or to bearer." § 3–104(1) (d). "An instrument is payable to order when by its terms it is payable to the order or assigns of any person therein specified * * *." § 3–110(1). We may assume, without deciding, that a money order though it does not use the word "order" uses equivalent language because the order, going beyond giving a direction to "PAY TO" a specified purchaser, states that "ownership of this order may be transferred to another person or firm if the person will write the name of such person or firm on the line marked 'pay to' before writing his own name on the second line." Compare Comment 5 to § 3–110. However, the money order adds, on the basis of 39 U.S.C. § 5104, already quoted, that "More than one endorsement is prohibited by law." Such a restriction is contrary to § 3–301 of the Uniform Commercial Code which provides that "The holder of an instrument whether or not he is the owner may transfer and negotiate it", and is out of harmony with § 3–206(1) which provides that "No restrictive indorsement prevents further

transfer or negotiation of the instrument." Thus it cannot be said that in all respects a postal domestic money order is like the ordinary negotiable instrument covered by modern codes and statutes. See United States v. Cambridge Trust Company, 1st Cir., 300 F.2d 76, 77.

■ However, today the postal money order has characteristics which make it sufficiently like a negotiable instrument to bring it within the principles underlying the rule of Price v. Neal and not within the general rule governing restitution in the ordinary situation where a payment of money is made under a mistake of fact.

The general rule is that "a person is entitled to recover money which he has paid another pursuant to the terms of a supposed contract with or offer from the other which, because of the payer's mistake of fact as to the existence of consent, of consideration, or of a required formality he erroneously believed to exist, if he does not get the expected exchange." Restatement, Restitution § 15. Thus restitution has been allowed where money was paid for a void instrument. Wood v. Sheldon, 42 N.J.L. 421; Jones v. Ryde, 5 Taunt. 488; Young v. Cole, 3 Bing. 724; Paul v. City of Kenosha, 22 Wis. 266.

Yet that general rule is not applied to forged signatures on negotiable instruments. The exception is stated in § 30 of the Restatement, Restitution as follows: "The holder of a bill of exchange or promissory note who has received payment thereof from one whose name was forged thereon as a party, or from a drawee on a bill on which the drawer's name was forged, is not thereby under a duty of restitution if he paid value and received payment without reason to know that the signature was forged." The comment then explains that "The rule stated in this Section is in accord with mercantile convenience, supporting the finality of transactions with mercantile instruments in situations where ordinarily it is reasonably possible for the payor to ascertain the fraud. Furthermore, the payee has

surrendered the instrument." § 3–418 of the Uniform Commercial Code codifies the same exception as follows: "payment or acceptance of any [negotiable] instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." The comment to § 3–418 states that "The section follows the rule of Price v. Neal, 3 Burr. 1354 (1762), under which a drawee who accepts or pays an instrument on which the signature of the drawer is forged is bound on his acceptance and cannot recover back his payment. Although the original Act is silent as to payment, the common law rule has been applied to it by all but a very few jurisdictions. The traditional justification for the result is that the drawee is in a superior position to detect a forgery because he has the maker's signature and is expected to know and compare it; a less fictional rationalization is that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered."

■ Almost all the policy considerations which led to the exception enunciated by Lord Mansfield in Price v. Neal in 1762 and codified in § 3–418 of the Uniform Commercial Code favor a rule that a bank which has received from the United States payment of a stolen domestic postal money order which appears fair on its face, but which bears the forged initials of an issuing employee and an unauthorized impression of an issuing office stamp is not thereby under a duty of restitution if the bank paid value and received payment without reason to know of the forgery and lack of authorization.

The first policy consideration is the desirability of finality of transactions in mercantile instruments. Confidence in such instruments depends in part upon an assurance that a series of commercial transactions with respect to them will not be upset. Perhaps that policy did not apply when a postal domestic money order was payable only at a post office, because

then domestic postal money orders were not mercantile instruments. But it has applied since 1951 when there was established a "new money order system" under which "The new money order may be cashed at any post office or bank. * *" Ann.Rep. of the Postmaster General, Fiscal Year Ended June 30, 1951, pp. 11, 12. Under that new system, which has been formalized in the already quoted 39 C.F.R. § 61.3 (b) (1), domestic commercial banks cash money orders and forward them to Federal Reserve banks for credit and the Federal Reserve bank collects payment from the United States Treasury. Ann.Rep. of the Postmaster General, Fiscal Year Ended June 30, 1952, p. 58. Indeed the symbol $\frac{15\text{--}119}{000}$ upon the face of the present-day money order is an obvious invitation to commercial banks to use the Federal Reserve banks and local clearing houses in a series of commercial transactions to effectuate payment by the United States Treasury of such an order.

The second policy consideration is that the Post Office Department is in a superior position to a bank to ascertain whether a particular postal money order has been stolen and that consequently there is a risk that the initial of the issuing employee will be forged and the validating stamp will be impressed without authority. Ordinarily before the Government is called upon to pay a stolen money order it will know of the theft, and of the risk of forgery. It can protect itself by instructing officials in the Treasury not to make payment through the Federal Reserve system or otherwise to an indorsee bank.

The third policy consideration is that if a bona fide purchaser of a postal money order does not get protection comparable to that of a holder in due course of a traveller's check, or a bank check, or an ordinary negotiable instrument, then the effect will be to lessen the market for postal domestic money orders and thus defeat one of the ultimate purposes of the present postal money order system.

Early authorities such as Bolognesi v. United States, 2d Cir., 189 F. 335, 337; Jaselli v. Riggs Nat. Bank, 36 App.D.C. 159, 31 L.R.A.,N.S., 763; United States v. Northwestern Nat. Bank & Trust Co., D.Minn., 35 F.Supp. 484, and United States v. Stockgrowers' Nat. Bank, C.C., D.Col., 30 F. 912 are distinguishable. They were addressed to a superseded system under which domestic postal money orders were finally payable only at a post office. They did not consider the system introduced on June 1, 1951 under which the Post Office induced banks to cash such orders and to seek payment of them through the Federal Reserve system from the United States Treasury, thus deliberately subjecting such orders to a series of commercial transactions.

Judgment for defendant.