**UNITED STATES of America, Plaintiff,**

v.

**FIRST NATIONAL CITY BANK, Defendant.**

**No. 76 CIV 1674.**

United States District Court, S. D. New York.

Aug. 16, 1978.

Robert B. Fiske, Jr., U. S. Atty. for the S. D. of New York, New York City (Mary C. Daly, Asst. U. S. Atty., New York City, of counsel), for plaintiff.

Shearman & Sterling, New York City, for defendant; Charles B. Manuel, Jr., New York City, of counsel.

SAND, District Judge.

Plaintiff, the United States, seeks in this action to recoup monies it paid to reimburse defendant, Citibank, N.A. (sued herein and formerly known as First National City Bank) ("Citibank"), for funds Citibank disbursed when it cashed postal money orders that had been stolen and forged. The principal issue is the validity of the postal regulations that authorize such recoupment. The Government has moved for summary judgment.

## I. BACKGROUND

### A. *FACTS*

Certain facts are not in dispute. In the course of three burglaries of post offices— at Buckfield, Maine on March 27, 1970, at Big Indian, New York, on December 30, 1970, and at Coxsackie, New York, on October 15–16, 1971—postal money order blanks were stolen, along with various stamps and equipment necessary for their validation. Thirty-nine money orders were cashed at various branches of Citibank. Defendant in turn presented them through the Federal Reserve Bank, which credited defendant's account and debited the Postal Service's account for the amount shown on the face of the money orders.

Pursuant to the usual United States Postal Service ("USPS") procedure for processing stolen money orders,[1] the Inspection Service of the Postal Service notified the Money Order Division of the fact of each theft at the time it occurred; the Money Order Division prepared a computer print-out listing the stolen money orders; the Money Order Division then compared this list with a weekly print-out from the Treasury of all money orders it received from

the Federal Reserve Bank, identified those stolen money orders which had been paid, retrieved the actual stolen money orders from the Treasury, made copies of them and sent reclamation letters to defendant. There are thus four significant events in this case: first, the initial theft of money order blanks from the post offices; second, the cashing of the forged money orders at Citibank; third, the presentment by Citibank of the cashed money order for reimbursement, and fourth, the demand for reclamation by the Postal Service.

On the average, a time period of approximately 15 days elapsed between the dates on which Citibank presented the stolen money orders to the Federal Reserve Bank and the dates on which the Postal Service notified it that they were stolen and demanded a refund pursuant to Postal Regulation 171.95, promulgated in 1970.[2] The regulation reads in pertinent part as follows:

"The Postmaster General shall have the right to demand refund from the presenting bank of the amount of a paid money order, if, after payment, the money order is found to have been stolen, or to bear a forged or unauthorized endorsement, or to contain any material defect or alteration which was not discovered upon examination . . . Such right shall be exercised within a reasonable time after the Postmaster General discovers that the money order has been stolen, or bears a forged or unauthorized endorsement, or is otherwise defective. If refund is not made by the presenting bank within 60 days after demand, the Postmaster General shall take such action as may be necessary to protect the interests of the United States."

Defendant has refused to refund payment of these stolen money orders, challenging the regulation both on its face and as applied.

---

1. Plaintiff's Response to Defendant's Interrogatories and Request for Production of Documents, Set III, No. 3. According to plaintiff, there is no reason to believe the procedure followed in this case differed in any material way from that usually followed.

2. Originally codified as 39 C.F.R. § 171.9, since 1975 the regulation has been included as Regulation 171.95 of the Postal Service Manual, which, in turn, is incorporated in the Code of Federal Regulations by reference. 39 C.F.R. § 111.1 (1978).

## B. *THE LAW PRIOR TO REGULATION 171.95.*

Prior to 1951, the system for payment of postal money orders was as follows: money order payees or indorsees could cash their money orders at a post office, or could cash them or deposit them for collection with a bank. If cashed or deposited with a bank, the bank would receive final payment at a post office. The few cases involving theft and forgery of money orders cashed at banks held that money orders were not negotiable instruments, but rather instruments which the Post Office Department issued in its sovereign capacity, as a public convenience, and that the Government therefore would not be held to the commercial standards governing the finality of payment of ordinary checks. Specifically, the Government was held to have the right, under federal common law, to reclaim payment of money orders found to have been stolen. *Bolognesi v. United States*, 189 F. 335 (2d Cir. 1911), *cert. denied*, 223 U.S. 726, 32 S.Ct. 525, 56 L.Ed. 632; *United States v. Northwestern National Bank*, 35 F.Supp. 484 (D.Minn.1940). This rule was incorporated in the Post Office Regulations in 1932. 39 C.F.R. § 72–27(g)(1939).[3]

Since 1951, however, banks which cash money orders receive final payment from the Treasury, through the Federal Reserve System, rather than at post offices.[4] In 1967, the District Court of Massachusetts (in *United States v. First National Bank of Boston*, 263 F.Supp. 298 (D.Mass.1967)) held that, given this new statutory scheme, money orders now sufficiently resemble other negotiable instruments so as to require the Government to abide by the "final payment rule" of the Uniform Commercial Code.[5]

The 1967 decision was not appealed and "in an effort to preclude further court decisions along the lines of *U.S. v. First National Bank of Boston*",[6] the Post Office issued Regulation 171.9 governing the payment of money orders.

## II. VALIDITY OF THE REGULATION ON ITS FACE

Defendant argues, first, that USPS lacks congressionally-delegated authority to enact Regulation 171.9, in that Congress has not expressly authorized the USPS to establish procedures for the revocation of postal money orders; second, that even if the Postal Service has such delegated authority, the decision of the Massachusetts District Court in *United States v. First National Bank of Boston, supra*, precluded the Service from promulgating a contrary rule; and third, that even if the former Post Office Department had the authority to promulgate such a regulation subsequent to the *First National Bank* decision, the restructuring of the Postal Service evidenced a congressional intent to treat the Postal Service as a business enterprise rather than a sovereign governmental entity, and that as a consequence, prevailing principles of commercial law, rather than federal law, should apply.

> "All . . . money orders paid by a bank will be forwarded through banking channels to a Federal Reserve Bank or Branch. These paid orders will not be delivered to a post office for reimbursement." 16 C.F.R. § 5993 (June 23, 1951).

**5.** U.C.C. § 3–418.

**6.** Letter from Jack T. DiLorenzo, Assistant General Counsel, to Regional Counsel, Minneapolis, Minnesota, September 1, 1970, annexed as Exhibit A, Plaintiff's Supplemental Response to Defendant's Interrogatories and Request for Production of Documents.

---

**3.** C.F.R. § 72.27(g)(1939) provided as follows:

"When a money order purporting to have been receipted by the payee or first indorsee is deposited in a bank for collection, the Postmaster at the office drawn upon may effect payment on the presentation of the same thereat by the bank, provided there be a clear understanding on the part of the bank that the latter will refund the amount if it afterwards appears that the depositor was not the true owner of the order."

The source for this section was Postal Laws & Regulations, Postmaster General, 1932. 39 C.F.R. § 17.1, note (1939).

**4.** The 1951 revision rescinded the prior regulation, codified in 1949 as 39 C.F.R. § 72.14, and added a note which provided that:

## A. DELEGATED AUTHORITY

Under the former Post Office Department statute, Congress provided that "In addition to his other duties, the Postmaster General shall—(1) prescribe rules and regulations that he deems necessary to accomplish the objectives of this title.". 39 U.S.C. § 501 (1970). More specifically, the Postmaster General was directed to "provide for the payment of money orders . . .". 39 U.S.C. § 5103(a)(1970). Defendant argues that this language does not allow for the revocation of payment once made, and that the regulation at issue "can only be read as an attempt by the Postal Service to thwart the Congressional intent". This argument proceeds from the comment of the District Court in *First National Bank of Boston, supra,* that (as a matter of policy) allowing for reclamation of money order payments would lessen the marketability of such instruments "and thus defeat one of the ultimate purposes of the present postal money order system".

■ However, the correctness of the District Court's opinion in *First National Bank of Boston* as to the marketability of postal money orders as a matter of practical policy does not govern the issue of whether the Postal Service has the *power* to issue such a regulation. The exercise of delegated power by an agency must be "reasonably related to the purposes of the enabling legislation". *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973). Thus, we must determine whether the power to reclaim from the presenting bank the payment of stolen money orders is reasonably related to the purposes of the Postal Service statute.

■ Under the former postal statute, 39 U.S.C. § 5101, Congress included a statement of purpose for the money order system: "[t]o promote public convenience, and insure greater security in remitting funds through the mail . . .". Defendant refers us to Judge Wyzanski's opinion in *First*

*National Bank of Boston* as authority for the proposition that the right of reclamation is not reasonably related to this purpose. Judge Wyzanski, dealing with the issue in the absence of any postal regulation and filling the vacuum created by agency silence on the question, considered whether such a claimed right would be a *wise* exercise of power; the question we have, now that a regulation has been promulgated, is whether its subject matter—reclamation of money order payments—is reasonably related to the establishment and operation of a postal money order system. We conclude that it is so related. The rights of the Postal Service with regard to presenting banks is without question part and parcel of the money order system, the operation of which is wholly delegated to the Postal Service. Thus, the regulation is not vulnerable on this ground.[7]

## B. THE EFFECT OF UNITED STATES v. FIRST NATIONAL BANK OF BOSTON

Defendant next argues that the Postal Service was precluded from promulgating this regulation by the decision of the District Court of Massachusetts, in *United States v. First National Bank of Boston, supra,* which held that the Post Office Department (as it then was constituted) had no right of reclamation and would be bound, instead, by the final payment rule of *Price v. Neal,* 3 Burr. 1354 (1762) as codified in the Uniform Commercial Code ("UCC")[8] which Judge Wyzanski adopted as federal common law.

Defendant asserts that, while Congress without question can overrule a District Court decision by statute, an agency such as the Postal Service may not: ". . . administrative agencies, unlike Congress, do not make law; they simply implement the laws made by Congress". (Br. at 14). Defendant stresses in its argument that this rule should carry particular weight in the area of commercial transactions involving federal instruments, in which the federal

---

7. Defendant concedes that the regulation was adopted pursuant to proper "notice and comment" procedures, 5 U.S.C. § 553 (1970).

8. U.C.C. § 3–418.

courts have developed a body of federal common law. In fact, defendant claims that the Postal Service's "attempt to overcome" the Massachusetts District Court's decision was "an improper abuse of administrative discretion".

Defendant presents no authority for this theory; we also have found none. Without doubt, the federal courts have played an extremely important role in developing the law applicable to federal negotiable instruments and commercial transactions. *See, e. g., Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *National Metropolitan Bank v. United States,* 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945). That development continues apace. *Bank of America National Trust & Savings Association v. United States,* 552 F.2d 302 (9th Cir. 1977); *United States v. City National Bank & Trust Co.,* 491 F.2d 851 (8th Cir. 1974).

 The role and importance of the federal courts in developing common law in the absence of applicable regulations, however, does not affect the established doctrine that a valid regulation has the force and effect of law and is as binding on the courts as is a statute. *K. Davis, Administrative Law of the Seventies,* § 5.03, at 147 (1976). If Congress may override a judicial decision by statute (assuming the statute's constitutionality), so too may an agency by means of a validly-promulgated regulation. Certainly, this is so when the prior conflicting judicial decision was based upon policy considerations in the absence of applicable administrative regulations.

### C. THE EFFECT OF THE POSTAL REORGANIZATION ACT OF 1970

[5] Defendant's final challenge to the facial validity of the reclamation regulation rests on the creation of the Postal Service in 1970 and its substitution for the Post Office Department. Postal Reorganization Act of 1970, P.L. 91–375, 84 Stat. 719, 39 U.S.C. § 101 *et. seq.* Defendant urges that this transfer embodies a congressional intent to end the sovereign nature of the Postal Service function and subject the Postal Service, as a business enterprise, to prevailing rules of commercial law such as the "final payment rule" of the UCC. In certain respects, it is true that the Postal Reorganization Act removed the protection of sovereignty from the Postal Service. The Second Circuit Court of Appeals has recently held, for example, that the wages of postal employees may be garnisheed. *Beneficial Finance v. Dallas,* 571 F.2d 125 (2d Cir. 1978). In other respects, however, the Postal Service is an arm of Government which is exempt from "ordinary" business rules. For example, the Second Circuit has even more recently upheld the constitutionality of the Postal Service's monopoly on mail delivery. The transfer of function to the USPS played no part in the decision. *United States Postal Service v. Brennan,* 574 F.2d 712 (2d Cir. 1978). In sum:

> "there is a limit to how far the private enterprise analogy can be pushed. While Congress has made the Service less like a government agency and more like a private business, the Service is still a hybrid; it does furnish an essential public service and has public functions and responsibilities."

*Chelsea Neighborhood Associations v. United States Postal Service,* 516 F.2d 378, 385 (2d Cir. 1975).

The Postal Reorganization Act certainly was intended to increase the independence of the Postal Service from congressional and other pressures, and to enable it to adopt more modern and efficient management techniques.[9] There is no indication, however, that these considerations were also to include a change in the commercial

---

**9.** As set forth in the House Report, the purpose of the proposed Act was to carry out the legislative recommendations of the President to:
 "Convert the Post Office Department into an independent establishment . . . freed from direct political pressures and endowed with the means of building a truly superior mail service.

Provide a framework within which postal employees . . . can bargain collectively
. . . .

Increase the pay of postal employees . . ."
The House Report expanded on these purposes somewhat, stating that the proposed reforms would:

rights of the Postal Service with respect to entities such as defendant.[10]

Thus, we find defendant's challenges to the validity of Regulation 171.9 on its face to be without merit. We turn next to defendant's contentions as to the validity of the regulation as applied in this case.

## III. VALIDITY OF THE REGULATION AS APPLIED

Defendant presents two challenges to the validity of the Postal Service Regulation as applied. First, it contends that the language of the regulation[11] allows the Postal Service to claim a refund only if the theft of a money order is discovered "after payment", and that in this case, the thefts were discovered long before payment, i. e., on the dates of the three burglaries or shortly thereafter. Second, defendant argues that the Postal Service failed to act within a "reasonable time" as required by two provisions of the regulation and is precluded from recovery for that reason.

### A. *DISCOVERY OF THEFT BEFORE PAYMENT*

■ The Government argues that the words "after payment" "obviously refer to the time at which a reclamation demand can be made, i. e., after the Postal Service has paid the money to the presenting bank".[12] This reading of the regulation, of course, makes the words "after payment" pure surplusage: surely there can be no demand for a refund until "after payment".

Defendant's contentions merit closer consideration, however, for they appeal to the apparent equities of the situation. Defendant's argument rests on a distinction between two types of theft situations. In the first, money order blanks are stolen through an obvious burglary or robbery; the theft is immediately known to the Postal Service, and the missing blanks can be identified. In the second, a "faithless employee" might steal both the blanks and the records which identify them, or might report the blanks as missing or destroyed when in fact they were stolen. In this case, the identity of the blanks—and even the fact of the theft—would not be known to the Postal Service for some time, quite possibly not until after they were cashed, presented and paid.

Defendant argues that Regulation 171.95, authorizing the Postmaster General to re-

---

"Enable the postal service to continue to provide—and extend and improve upon—the present quality and scope of postal service in the face of the tremendous increases of mail volume that are expected in the future;

Eliminate serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with the modern management and business practices that must be available if the American public is to enjoy efficient and economic postal service;

Modernize limitations on the authority of the postal service to procure transportation for mail . . .;

Provide postal employees with decent and modern working environments . . .;

Improve postal employee-management relations . . .;

Adjust the salaries of postal employees . . .".
*H.R. Rep. No. 91–1104*, 91st Cong., 2d Sess. 2, *reprinted in [1970] U.S.Code Cong. & Admin. News*, pp. 3649, 3650.

10. The Postal Reorganization Act authorizes the Postal Service to keep its own system of accounts and to issue its own obligations. 39 U.S.C. section 401(4), 2005–2007 (Supp. V 1975). These reforms of the system's financial structure, however, evidence no congressional intent that the Postal Service be subject to all usual commercial rules.

11. In pertinent part, Reg. 171.95 reads as follows:

"The Postmaster General shall have the right to demand refund from the presenting bank of the amount of a paid money order, if, after payment, the money order is found to have been stolen, or to bear a forged or unauthorized endorsement, or to contain any material defect or alteration which was not discovered upon examination . . . Such right shall be exercised within a reasonable time after the Postmaster General discovers that the money order has been stolen, or bears a forged or unauthorized endorsement, or is otherwise defective. If refund is not made by the presenting bank within 60 days after demand, the Postmaster General shall take such action as may be necessary to protect the interests of the United States."

12. Plaintiff's Br. at 5.

claim payment of "a paid money order if, after payment, the money order is found to have been stolen", applies only to the latter situation. Where a money order is known to have been stolen, and can be identified and listed, defendant argues that "[i]t would have been an easy task to program the examining computer to promptly reject any incoming money order that appeared on the list." [13] Defendant would thus put the loss on the party better able to prevent it, the Postal Service.

Defendant thus argues that where, as here, the Postal Service knew that money order blanks had been stolen, any loss ensuing from payment of those money orders should remain with the Government and that the regulation requires that result.

Our reading of Regulation 171.95 leads us to conclude that either, as the Government contends, the phrase "after payment" is a redundant reference to the time when a question of refund arises, or that still a third construction of the phrase, leading to the same result, is the correct one.[14]

The difficulty in reading this regulation arises from use of the words "the money order" in the first sentence: do these words refer to money order blanks, or only to money orders that have been cashed and paid? Defendant contends that they refer to blanks, and that, therefore, the regulation may be read as follows: " . . . if, after payment, the money order [blank] is found to have been stolen . . . ". We disagree, and read the regulation to mean: " . . . if, after payment, the [paid] money order is found to have been stolen . . . ".

We note, first, that the regulation, taken as a whole, does not define the term "money order" except as "a U. S. Postal Money Order". Section 171.921. This definition appears simply to distinguish postal money orders from those issued by banks. Examining the textual context of the words in question, we note that the term "the money order" appears to refer to the term "paid money order", which precedes it in the sentence. The term "paid money order" is not a separately-defined term, and we believe that the drafters omitted the word "paid" simply to avoid repetitious wording when they again referred to such [i. e., paid] money orders later in the same sentence.

Finally, we consider the purpose of the regulation. Section 171.95 is an attempt to protect the Postal Service against losses due to payment of money orders which have been stolen and forged. Thus, the Postal Service's concern is with money orders that have been stolen and *paid*. The regulation itself makes no distinction between money order blanks stolen through burglary or robbery and those stolen through more surreptitious means, and indeed, that distinction is immaterial to the Postal Service's attempt to protect itself in the case of theft and forgery of money orders.

Defendant's argument that the Postal Service is better able to protect both itself and presenting banks when it knows that money order blanks have been stolen is thus weakened by the fact that this regulation clearly was intended by the Postal Service to afford maximum protection to the Government rather than to the banks. Further, we note that the Postal Service published the identifying serial numbers of the stolen money order blanks in the Postal Register, a Postal Service newsletter which is available to defendant by subscription. If, as defendant contends, the Postal Service's knowledge of the theft is material to this regulation, then the availability of that knowledge to defendant is a factor that must also be considered.

As discussed earlier, however, we do not base our construction of this regulation on the equities of the matter, but rather on our reading of the language of the regulation and its purpose.[15] We find that, read

---

13. Defendant's Br. at 18.

14. It may very well be that the difference between the Government's contention and the third construction of the phrase, which we prefer, is merely semantic.

15. We note that the primary consideration of the court in construing the meaning of a regu-

as a whole, the regulation refers only to the discovery by the Postal Service that it has paid a stolen money order, not to the discovery of the original theft itself.

According to the usual Postal Service procedure outlined above, the Postal Service would discover the fact of payment only after Postal Service employees compare the Postal Service list of stolen money orders with the Treasury's most recent weekly list of paid money orders. Hence, we reject Citibank's contention that the reclamation procedure is unavailable to the Government because it discovered the theft before, not after, payment.

### B. COMPLIANCE WITH "REASONABLE TIME" REQUIREMENTS

Defendant's second contention is that the Postal Service failed to comply with the regulation's time requirements. Regulation 171.9 requires that the Postal Service act "within a reasonable time" with respect to two steps in the payment and reclamation procedure: first, section 171.93 provides that "[t]he Postmaster General has the usual right of a drawee to examine money orders presented for payment through the Federal Reserve System and to refuse payment of money orders and shall have a reasonable time after presentation to make such examination". Second, section 171.95 requires that the Postmaster General exercise his right to demand a refund "within a reasonable time after [he] discovers that the money order has been stolen".

### A. TIME FOR EXAMINATION

■ With respect to the money orders involved in this case, the average time interval between presentment and demand for reclamation has been calculated by defendant, based on dates supplied by plaintiff, as 14.8 days.

This Court is unable to determine, as a matter of law, that in this context, 14.8 days is either "reasonable" or "not reasonable". Moreover, at the time the Postal Service promulgated this regulation, it apparently contemplated that "[w]hat is a reasonable time within which to examine an order and after discovery of a defect, to claim a refund, will depend upon the particular facts and circumstances in each case".[16] It apparently also was contemplated that "the bank will normally be notified very promptly".[17] Certainly, the time actually elapsed was far longer than that allowed under the UCC.[18] As we have already discussed, however, this case is not governed by the UCC. There thus remains a question of fact and an evidentiary hearing is required to determine whether the Postal Service complied with its self-imposed requirement that it make its examination "within a reasonable time after presentation".[19]

### B. TIME TO DEMAND A REFUND

[8] Defendant's final contention is that the Postal Service failed to make its demand for a refund "within a reasonable time after the Postmaster General discover[ed] that the money order[s] ha[d] been stolen". As noted earlier, we construe the term "money order" to mean a paid money order and as discussed above, we find that the critical discovery is made when Postal Service staff compiles its list of paid stolen money orders.

According to plaintiff,[20] the relevant time intervals in its processing of the money orders in question were as follows: it re-

---

lation or statute is the intent of the promulgating body.

**16.** Letter from Jack T. DiLorenzo, Assistant General Counsel, to Mr. C. G. Miller, Senior Vice-President, Federal Reserve Bank of Cleveland, July 10, 1970, annexed as Exhibit A, Plaintiff's Supplemental Response.

**17.** Id.

**18.** U.C.C. section 4–301, 4–104(h).

**19.** Many of Citibank's contentions with respect to the practical operation of the system and the ability of the parties to take measures to prevent loss may be relevant to what time interval, in this context, is contemplated by a requirement of reasonableness.

**20.** Plaintiff's Supplemental Response to Defendant's Interrogatories and Request for Production of Documents, Sets II and III at 2–3.

ceived a Treasury printout listing money orders within 24 hours after the list was prepared by the Treasury; Money Order Division staff completed their comparisons of the Treasury list and the Postal Service "stolen money order" list during the working day on which the Treasury list was received. At this point, knowledge that stolen money orders had been paid may be attributed to the Postmaster General. It took approximately three hours to compare the printouts, two hours to physically retrieve the stolen money orders from Treasury, two hours to make copies of them and two hours to prepare and mail the reclamation letters. Thus, a total of six hours elapsed between the time the "paid stolen money orders" list was prepared and the reclamation letters were sent to defendant. The Court finds that, as a matter of law, this was a "reasonable time" within the meaning of Regulation 171.95.

### SUMMARY

The Court holds that United States Postal Service Regulation 171.9 is valid on its face. It finds that the Postal Service complied with Regulation 171.95 by making a demand for refund from Citibank within a reasonable time after discovery that stolen money orders had been paid. The Court further finds that a question of fact remains as to whether the Postal Service complied with Regulation 171.93 in making its examination of the money orders in question within a reasonable time after presentation.

Plaintiff's motion for summary judgment is denied.

SO ORDERED.