The **COLUMBIAN PEANUT COMPANY,**
Plaintiff-Appellant,

v.

**Harry FROSTEG et al., Defendants, The Bank of Camilla and Farmers Bank of Pelham, Defendants-Appellees.**

No. 72-1224.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1973.

Rehearing and Rehearing En Banc
Denied April 13, 1973.

H. Thaxton Monk, Jr., Pelham, Ga., Robert A. Elsner, Atlanta, Ga., for plaintiff-appellant.

Frank S. Twitty, Camilla, Ga., for Bank of Camilla.

Fred B. Hand, Jr., Pelham, Ga., for Farmers Bank.

Before RIVES, WISDOM and RONEY, Circuit Judges.

RIVES, Circuit Judge:

In July 1970, Columbian Peanut Company (Columbian) entered into a written contract with Frosteg and his wholly-owned corporation, Pelham Peanut Company, by which Frosteg, on a commission basis, was to purchase and store peanuts for Columbian during the 1970 crop season in the peanut growing area of southwest Georgia. During the 1969 crop season a similar arrangement had existed between Columbian and Frosteg. The manner, time and quantity of the purchases were left to Frosteg's discretion.

Carrying out that agreement, Columbian turned over to Frosteg several hundred blank checks signed by Columbian and drawn on five banks (including Farmers Bank of Pelham, but not including Bank of Camilla) located in rural southwest Georgia. Frosteg usually left the blank checks at Columbian's office in Pelham, Georgia, and hired two of Columbian's employees, Mrs. Charlene Lawhorne and Mrs. Sue Strickland, to work during their off-duty hours computing the totals of each day's purchases and writing on each Columbian check the appropriate amount and the name of the respective grower-payee. The checks would then be given to Frosteg or one of his other employees. Some of the named payees actually received their checks. In a number of other instances, to keep current the bank balances of Frosteg and Pelham Peanut Company, Frosteg forged the signatures of the payees and then deposited the checks usually to the credit of Pelham Peanut Company. Frosteg would then issue to the grower a Pelham Peanut Company check in the same amount as the Columbian check. This fraudulent practice was long continued apparently without discovery, and certainly without complaint. During the preceding peanut season of 1969, Frosteg had so endorsed some 93 checks payable to various payees, totaling $139,291.99. The fraud was apparently not discovered until Pelham Peanut Company's checks began "bouncing" in the latter part of September, 1970. The growers named as payees in 37 of the Columbian checks, totaling $55,645.33, fraudulently endorsed by Frosteg and cashed by the Bank of Camilla, and the growers named in 2 of the checks, totaling $2,020.63, fraudulently endorsed by Frosteg and cashed by Farmers Bank of Pelham, were not paid by either Frosteg or his corporation. Shortly before his fraud was discovered, Frosteg borrowed $20,000.00 from Farmers Bank of Pelham and assigned as security commissions claimed to be due him. Columbian accepted the assignment.

Columbian had received the peanuts purchased, or peanuts of like quantity and quality, and Columbian ultimately paid the agreed purchase price to each of the unpaid growers. Columbian then brought this suit asserting a right to reimbursement. Frosteg and Pelham Peanut Company did not answer or defend, but unfortunately they are insolvent. Both Bank of Camilla and Farmers Bank of Pelham answered at length. Farmers Bank of Pelham also cross-claimed on Columbian's acceptance of Frosteg's assignment of his commissions.

The liability vel non of the banks for payment on the forged endorsements of Columbian's checks turns largely on an oral agreement of Columbian with each of the banks. Columbian never made any deposit with the Bank of Camilla. It did carry a deposit in the Farmers Bank of Pelham but the checks here in-

volved were not to be charged against that deposit. Columbian's oral agreement with each bank and with other banks in that area was to the effect that the bank would pay its checks to growers for peanut purchases as presented; at the end of each banking day the bank would tally or total the checks and either mail or present them to Columbian's office in Pelham; Columbian would then give the bank its check drawn on the First National Bank of Atlanta for the total amount of that day's checks; as compensation for the use of the bank's money and for its services, Columbian would pay to the bank a fee of ⅛ of 1% of the total amount of Columbian's checks so handled.

The case was tried to a jury. The district court reserved ruling on the Bank of Camilla's motion for directed verdict. The jury returned a verdict against the Bank of Camilla for $23,624.10, an admittedly inadequate amount if Columbian should have any recovery. The jury returned a verdict for $20,000.00 in favor of the Farmers Bank of Pelham on its cross-claim.

On post-trial motions, the district court held that Columbian is not entitled to recover against either bank. It entered judgment notwithstanding the verdict for the Bank of Camilla, and also granted the alternative motion of the Bank of Camilla for a new trial in the event the judgment n. o. v. should be set aside or reversed on appeal. The district court denied Columbian's motion for new trial as against Farmers Bank of Pelham and also denied Columbian's motion for a partial new trial against the Bank of Camilla. Columbian appeals from the judgments entered against it on the post-trial motions.

We hold that the district court erred in ruling as a matter of law that Columbian is not entitled to recover against the banks on its claims that they wrongfully paid Columbian's checks bearing forged endorsements, but that the district court did not err in denying Columbian's motion for new trial with respect to Farmers Bank of Pelham's cross-claim against Columbian.

## I.

*Columbian's Claims That the Banks Wrongfully Paid Columbian's Checks Bearing Forged Endorsements.*

A. *Responsibility as Between Drawer of Check and Bank.*

In its memorandum opinion on the post-trial motions, the district court said:

"In considering the question here presented it is important to keep in mind that the relationship of bank and depositor did not exist in this case because Columbian never had an account at The Bank of Camilla. Therefore, the principle of law regarding the responsibility of a bank to its customers has no application here * * *."

[App. 516]

■ Concededly the question is a difficult one, and no case has been found where the precise relationship existed as that between Columbian and the banks in this case. Nonetheless, we are persuaded that each bank's oral contract, based on agreed consideration to pay Columbian's checks as presented, placed upon the bank the same responsibilities and liabilities as if the checks had been paid from a general deposit of money by Columbian in the bank. In the latter case the law has been long established in Georgia that:

"Where one deposits money in a bank on general deposit, the bank immediately becomes the debtor of the depositor for the money deposited, and undertakes, impliedly, to pay that money either to the depositor or to some person to whom he directs it paid; and, in order to discharge itself from this liability to the depositor, the bank must pay the money to the depositor, or as directed by him. The liability cannot be discharged in any other way. In the present case Burke, the depositor, drew a check in favor of

Mrs. Knapp for a certain amount of money, and the bank did not pay the money to her or to her order, but paid the money to Knapp, upon a forged indorsement. How does the bank discharge its indebtedness to Burke? It has not paid the money to Burke, or to the person to whom he directed it to be paid, or to her order; and it is only in these ways that the bank can be discharged of its liability."

Atlanta Nat. Bank v. Burke, 1888, 81 Ga. 597, 7 S.E. 738, 739. The Georgia courts have continued to follow the *Burke* case. Insurance Co. of North America v. Fourth National Bank, N.D. Ga.1926, 12 F.2d 100, aff'd 28 F.2d 933 (5 Cir. 1928); Fulton National Bank v. Didschuneit, 92 Ga.App. 527, 88 S.E.2d 853 (1955); Citizens & S. National Bank v. New York Cas. Co., 84 Ga.App. 47, 65 S.E.2d 461 (1951).

█ The *Burke* case is also in accord with the law generally prevailing in other states:

"Ordinarily, as between the drawer of a check and the bank upon which it is drawn, the latter is bound at its peril to determine the genuineness of the endorsements upon which it is paid; it cannot, if the drawer is free from negligence or conduct warranting his estoppel, charge against the drawer's account a check payable to a named payee or his order and paid upon a forged endorsement."

10 Am.Jur.2d, Banks § 623, p. 587. See also 9 C.J.S. Banks and Banking § 356c, p. 734 et seq.

█ In general the drawer of a check has like rights against an intermediary bank which cashes a check on a forged endorsement and collects it from the drawee bank.

"Although not agreeing uniformly in the reasons given for their decisions, most courts hold as a general rule that an intermediary bank which receives a check on a forged indorsement and collects it from the drawee bank is liable to the drawer of the check for his loss, the bank's acceptance of the check for collection being at its peril as to a possible forged indorsement."

10 Am.Jur.2d, Banks § 629, p. 596. The note appended to this text states in part:

"The theory upon which recovery has been allowed by some well-considered cases has been that of the implied obligation to pay to the true owner the money received by the collecting bank and erroneously paid by it to the wrongdoer on the strength of the forged indorsement * * *."

█ Other theories are discussed in an annotation in 99 A.L.R.2d 638, 640–648. Apart from questions of negligence or other conduct of the drawer operating to preclude him, these strict rules of responsibility of the bank apply despite the fact that the person who forged the endorsement was an agent or employee of the drawer. First National Bank v. Guaranty Life Ins. Co., 1962, 45 Ga.App. 289, 164 S.E. 212; cases collected in Ann. 39 A.L.R.2d at 648.

The Uniform Commercial Code adopted by the Georgia Legislature, effective January 1, 1964, left applicable the general principles of law not particularly displaced, Georgia Code Ann. 109A–1–103.

Specifically, Georgia Code Ann. 109A–4–102(2) provides that:

"(2) The liability of a bank for action or nonaction with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located."

Section 109A–4–104 contains the following pertinent definitions:

"(g) 'Item' means any instrument for the payment of money even though it is not negotiable but does not include money."

"(a) 'Account' means any account with a bank and includes a checking, time, interest or savings account."

"(e) 'Customer' means any person having an account with a bank or for

whom a bank has agreed to collect items and includes a bank carrying an account with another bank."

We think that Columbian was a "customer" of the bank within the foregoing definition for either of two reasons. (1) Columbian had an "account" with the bank, though the account was tallied daily. By statute (§ 109A–4–104(a)) " 'account' *means any* account with a bank and *includes*" the usual accounts. [Emphasis added.] "Account" is not limited to the accounts specifically named. (2) The bank had agreed to collect "items" for Columbian. For a consideration the bank agreed to cash and collect Columbian's checks. Those checks were clearly "items" as defined in the Act (§ 109A–4–104(g)).

True, the "customer" owes certain duties to discover and report unauthorized signatures or alterations as specifically provided by Georgia Code Ann. 109A–4–406. Columbian did not and does not ask that judgment be rendered by the court in its favor but simply that it be accorded a trial by jury. For that reason, it would be premature for us to discuss the duties of the customer further than to observe that Columbian is not barred by the one-year limitation prescribed by section 109A–4–406(4)(b):

"(4) Without regard to care or lack of care of either the customer or the bank

" * * *

"(b) a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report any alteration on the back of the item or any unauthorized indorsement is precluded from asserting against the bank such alteration or unauthorized indorsement."

Thus Columbian falls within the strict letter of the Uniform Commercial Code as a "customer" of the bank.

Of more importance, the considerations of policy which impose a strict measure of responsibility upon a bank arising from the contract either of the

drawer bank or of an intermediate bank would seem to apply also in favor of Columbian as the drawer of a check paid by a bank pursuant to a contract, even though the contract is not that of a general depositor. The bank's opportunity to determine whether an endorsement is genuine is usually better than the opportunity of the drawer of the check. The bank is also in better position to protect itself by insurance. Under usual commercial practices, such policy considerations place a strict responsibility upon a bank which contracts to cash a drawer's checks.

We conclude that the district court erred in ruling that "the principle of law regarding the responsibility of a bank to its customer has no application here."

### B. *Effect of Columbian's Reacquisition of Its Checks.*

Columbian was liable to each grower who delivered his peanuts to Pelham Peanut Company on the faith of Pelham's own check, because the peanuts were delivered to Columbian's commission agent and ultimately either the same peanuts or peanuts of like quality and quantity were delivered to Columbian. Columbian's check intended for the grower was forged by Frosteg instead of being delivered to the grower. As between Columbian and the grower, Columbian's check did not become a completed contract, though it did constitute evidence of Columbian's liability to pay for the peanuts purchased.

In paying each grower, Columbian received his affidavit that he had not endorsed Columbian's check, had never given anyone authority to endorse it for him, and had not received its proceeds. Columbian also had each grower sign on the back of its check already in its possession an endorsement reading, "Pay to the order of Columbian Peanut Company."

The checks were delivered by the banks to Columbian when it reimbursed the banks for their payment. Each bank had in its customary routine

stamped its endorsement on each check reading, "Pay to Any Bank, Banker or Trust Company. All Prior Endorsements Guaranteed."

Under Georgia Code 109A–4–201, such an endorsement runs only to a bank, banker or trust company. Consequently, Columbian cannot base its right to recover from the bank on the guarantee contained in the endorsement. In effect, that endorsement coupled with the delivery of the check to Columbian destroyed its negotiability. The responsibility of the banks to Columbian is based on a claim that the banks wrongfully paid Columbian's checks bearing forged endorsements, and not on the terms of the banks' endorsements of the checks.

The district court held that "Columbian reacquired the checks by paying the original grower-payees whose names were fraudulently endorsed and thereby gained physical possession of the checks." [App. 518.] After such "reacquisition," according to the district court's holding, Columbian was barred from any recovery against the banks by Georgia Code sections 109A–3–208[1] and 109A–3–601(3).[2]

We do not agree. Columbian got possession of the checks when the banks were reimbursed, not at the later time when Columbian paid the original grower-payees. Further, those sections of the Uniform Commercial Code should not have the effect of penalizing Columbian for paying the growers of the peanuts which (or the equivalent of which) it had received. By getting the grower-payee to endorse the check already in Columbian's possession, and which had ceased to be a negotiable instrument, Columbian did not relinquish its claim against the bank for wrongfully paying the check bearing a forged endorsement. Precisely to the contrary, Columbian's conduct went to prove the damage which Columbian suffered from the bank's paying to another its check intended for the grower, but of which the grower never became a holder. Sections 109A–3–208 and 109A–3–601(3) are intended to serve another and unrelated purpose of eliminating circuity in the order of responsibility. Otherwise construed, the sections would have the effect of radically depleting the rule of strict responsibility of a bank for paying a check upon a forged endorsement.

### C. Frosteg as Agent for Columbian.

In entering judgment n. o. v. against Columbian on its claim against the Bank of Camilla, the district court ruled:

"The evidence adduced upon the trial of this case clearly showed that Frosteg, acting through his company, Pelham Peanut Company, was an agent of Columbian. This is shown by the contract entered into between them, by the testimony of Columbian's manager, and by Frosteg himself. After discovering the forgeries of its agent Columbian voluntarily paid all of the grower-payees whose names Frosteg had forged and by so doing Columbian ratified the acts of Frosteg and it is bound by his fraudulent acts and cannot now recover against The Bank of Camilla as a matter of law." [App. 519, 520.]

The first paragraph of the written contract between Columbian and Fros-

---

1. "109A–3–208: *Reacquisition.*—Where an instrument is returned to or reacquired by a prior party he may cancel any indorsement which is not necessary to his title and reissue or further negotiate the instrument, but any intervening party is discharged as against the reacquiring party and subsequent holders not in due course and if his indorsement has been cancelled is discharged as against subsequent holders in due course as well."

2. § 109A–3–601(3):
   "(3) The liability of all parties is discharged when any party who has himself no right of action or recourse on the instrument
   "(a) reacquires the instrument in his own right; or
   "(b) is discharged under any provision of this Article, except as otherwise provided with respect to discharge for impairment of recourse or of collateral (109A–3–606)."

teg's company, Pelham Peanut Company, expresses the gist of their agreement:

"We have agreed with you that you will buy and store Spanish and Runner Segregation I Farmerstock peanuts in our name and for our account this season, 1970 Crop, at your place of business known as PELHAM PEANUT COMPANY located at Pelham, Georgia, and for such service we agree to pay a fee of $10.00 per net ton for Spanish Farmerstock and $11.-00 per net ton for Runner Farmerstock." [App. 534.]

■ That agreement did not encompass purchases made in the name of Pelham Peanut Company and paid for by Pelham's own check. In so conducting his business, Frosteg departed completely from the scope of his agency for Columbian. When later Frosteg delivered the peanuts or their equivalent to Columbian, and Columbian accepted them thinking that they were peanuts paid for by Columbian's check, Columbian became liable to the growers for the agreed purchase price because Columbian received the benefit of the growers' peanuts. Thus Columbian had become liable to the growers before it discovered the forgeries of Frosteg. Columbian's subsequent payments for the peanuts did not, in our opinion, ratify the fraudulent acts of Frosteg, but was simply performance of its liability incurred before it had any knowledge of Frosteg's fraudulent acts.

We conclude that the district court erred in ruling, as a matter of law, that Columbian is not entitled to recover against the banks on its claims that they wrongfully paid Columbian's checks bearing forged endorsements. On that issue the case should stand for a new trial.

## II.

*Cross-claim of Farmers Bank of Pelham*

As has been stated, the jury returned a verdict in favor of the Farmers Bank of Pelham on its cross-claim for $20,000.00. Frosteg had borrowed that amount from the bank and had assigned as collateral security the commissions due him. The notice of assignment and Columbian's acceptance read as follows:

"September 14, 1970
"Columbian Peanut Company
"Pelham, Georgia 31779
"Dear Mr. Johnson:
"Please accept this letter as notice of my assignment of the commissions due me in 1970 from Columbian Peanut Company, Inc. When the commissions are paid, I would appreciate you making the check payable jointly to Pelham Peanut Company and Farmers Bank of Pelham and sending the check directly to the Bank. I further acknowledge that the commissions due as of this date are in excess of $20,000.00.
"Please acknowledge this letter by signing in the space indicated and returning it to the Bank in the envelope provided.
          "Sincerely,
     "(Signed) HARRY FROSTEG
          "Harry Frosteg
          "Pelham Peanut Company
"Accepted this 15th day of
     September, 1970.
          "THE COLUMBIAN PEANUT COMPANY
"(Signed) H. A. JOHNSON
          MANAGER"
[App. 550–551.]

■ Thus Columbian accepted an assignment representing that "the commissions due as of this date are in excess of $20,000.00." In addition, there was evidence from which the jury could have found that Columbian's manager had by telephone confirmed to the officer of the bank, who was considering the loan to Frosteg, that Frosteg had "earned" in excess of $20,000.00 in commissions. We find no reversible error in the district court's charge with respect to the counterclaim. The district court did not abuse its discretion in denying Columbian's motion for new trial as to the counterclaim of Farmers Bank of Pelham.

The briefs and arguments of the respective parties raise other issues and questions which we have considered but

find not necessary to discuss. The judgment for the Bank of Camilla entered notwithstanding the verdict is reversed and the case against that bank is remanded for a new trial. The judgment denying the motion of Columbian to grant a new trial with respect to its claim against Farmers Bank of Pelham is reversed and the case is remanded for a new trial on Columbian's claim that said bank wrongfully paid Columbian's checks bearing forged endorsements. The judgment denying Columbian's motion for new trial on the cross-claim of Farmers Bank of Pelham against Columbian is affirmed, provided that if the judgment on that cross-claim has not been earlier satisfied, Columbian shall be entitled to credit against it the amount of any judgment which it may recover against the Farmers Bank of Pelham on its claim against said bank. The costs of appeal are taxed three-fourths against the Bank of Camilla and one-fourth against the Farmers Bank of Pelham.

Affirmed as to the cross-claim of Farmers Bank of Pelham and reversed and remanded as to Columbian's original claims.