[No. H000863. Sixth Dist., Apr. 17, 1987.]

CENTRAL BANK, Plaintiff and Respondent, v.
KAIPERM SANTA CLARA FEDERAL CREDIT UNION, Defendant
and Appellant.

188

**COUNSEL**

H. R. Lloyd, Jr., Scott R. Moske, Hoge, Fenton, Jones & Appel, Mary K. Ison, Charles H. Bowen and Finch & Bowen for Defendant and Appellant.

Ted W. Harris, Paul A. Bruno, Richard A. Lapping, Michael D. Freeman and Thelen, Marrin, Johnson & Bridges for Plaintiff and Respondent.

**OPINION**

**BRAUER, J.**—Nineteen blank money orders were stolen from a branch office of Kaiperm Santa Clara Federal Credit Union (Kaiperm), filled out in varying amounts and subsequently paid by Central Bank (Bank). Bank brought suit against Kaiperm for damages and declaratory relief, claiming that Kaiperm had breached its duties under a written trust agreement by failing to safeguard the blank forms. Kaiperm based its defense primarily upon the theory that the rules of the commercial code apply to fix liability between the parties.[1] Under the code, when a negotiable instrument such as a check is forged and passed through banking channels, the loss is normally borne by the payor bank. The trial court found that the money orders were not negotiable instruments, and that the code did not otherwise apply to determine the rights of the parties. It ruled that Kaiperm had breached the trust agreement and that the indemnification clause contained therein was valid and enforceable. We agree with the trial court and affirm the judgment in favor of Bank.

---

[1]The California version of the Uniform Commercial Code, adopted in 1965, does not differ materially from the offical text with respect to the sections at issue here. We will be referring throughout to "the code," "the commercial code" and "the UCC" interchangeably. Citations will follow the notation scheme of the California statute.

## Summary

Kaiperm is a credit union serving the employees of five bay area Kaiser hospitals and the Permanente Medical Plan. Bank is a large commercial bank based in Walnut Creek with branches nationwide. As part of its business, Bank operates a money order division which sells money orders through a network of over 2,000 agents from the east coast to Hawaii. Kaiperm was one of these agents.

*Background. The Operation of the Money Order Business*

The operation of Bank's money order division is substantially similar to that of its competitor banks. Bank's agents include not only financial institutions such as Kaiperm, but also chain stores, liquor stores and other retail outlets. The agents function like tellers. They are authorized to sell money orders within prescribed limits, ranging from several hundred dollars to thousands of dollars.

Two types of money orders are relevant here: "personal money orders" which are sold only to members of the general public, usually in amounts under $1,000, and "voucher money orders" which can also be purchased by the agent for its own use and generally have a much higher limit, in this case $40,000.

The relationship between Bank and its agent is set forth in a contract prepared by Bank. Once an agent has signed a contract, Bank provides the agent with a supply of money order forms printed to the agent's specifications. The money orders are encoded with sequential serial numbers by which Bank can identify the agent to which they are issued. They are printed in triplicate.

Bank charges its agents a flat rate for each money order, regardless of its eventual face value, and dictates the fee which the agent may charge its purchaser. In the course of a normal transaction, the agent fills out the amount of the money order, collects the face amount and the fee from the purchaser, and gives the purchaser the original and the triplicate copy, retaining the duplicate. The agent either instructs the purchaser to fill in the date and the payee, or completes this information for the purchaser at the time the money order is purchased.

The money collected from the purchaser is deposited into a trust account maintained by the agent solely for this purpose in a bank designated in the contract. The agent prepares a daily sales report, listing the money orders sold and attaching the corresponding duplicate copies. This report is then

sent to Bank, along with a check drawn on the trust account covering the total amount of the money orders sold, plus Bank's fee.

A money order customer will generally be someone who does not have a regular checking account and may use a money order like a check to pay a bill. When the purchaser uses the money order, it passes through normal collection channels and is eventually paid by Bank. Because of the speed of this collection process in comparison with the postal service, the original money order will almost always reach Bank before Bank receives the sales report and remittance forwarded by the agent. When the money order is presented for payment, Bank automatically credits the presenting Bank, subject to a 24-hour reclamation period during which Bank runs a check to make sure that 1) the imprinted serial number is one issued to an authorized agent, 2) the amount does not exceed the limit printed on the money order and 3) no stop payment has been ordered. If there are no discrepancies, payment is final 24 hours after presentment.

This process by which Bank pays an item before receiving the supporting paperwork is called "prepayment." James Newman, operations manager /treasurer of one of the three largest commercial issuers of money orders in the United States, testified that to his knowledge every money order business prepays money orders. "Ninety-nine percent plus of the time" the money order is paid before the supporting paperwork is received from the agent. According to Lloyd Lundquist, manager of Bank's money order division, the prepayment procedure is a means by which the customer can be assured that his payments to creditors will be honored. If for example a customer makes his mortgage payment with a money order, which then arrives at Bank before Bank has received the funds from its agent, "We could hardly return it to the customer and put him in a position where he may lose his home."

Bank processes between 40,000 and 60,000 money orders per day. Processing is done by computer. The computer pairs up those items paid with those for which a remittance and duplicate sales slip have been received from the agent. A list of prepaid items, for which there has been no corresponding accounting, appears on a daily computer printout, listed by agent. Usually the documentation for these so-called "prepaids" is received within a few days, whereupon they drop off the list.

Bank employs a number of field representatives, whose job it is to follow up and collect those items which remain on the prepaid list. The usual practice of the field rep is to contact the agent by phone after a prepaid appears on the list for more than 10 days. Generally a bill is sent to the agent after approximately 21 days. It is apparently not unusual, however, for items to remain on the prepaid list for 30 to 60 days.

*The Kaiperm-Bank Operation*

*The Contract.* In 1977 Bank and Kaiperm entered into a contract entitled "Personal Money Order Agency and Trust Agreement" under which Kaiperm became an authorized agent and trustee of Bank for the sale of personal money orders in amounts not exceeding $1,000 each. In 1978, the contract was amended to include authorization for the sale of the $40,000 limit voucher money orders. The pertinent terms of the contract follow.

Kaiperm agreed to "receive and hold IN TRUST for BANK Money Orders and equipment delivered to TRUSTEE by BANK" (¶3(a)), and "to sell and issue such Money Orders only in accordance with instructions from BANK" (¶3(b)). All unused money orders were to remain Bank's property, having been furnished to Kaiperm for use solely in accordance with the agreement.

Paragraph 5(c) provided that the "TRUSTEE shall be responsible for the proper safeguarding of such supplies, equipment and monetary receipts, and will reimburse the BANK for any loss arising out of damage to, destruction, disappearance, theft, embezzlement or other loss of said supplies, equipment and/or trust funds until such time as these items and/or trust funds are actually received by BANK." Bank was authorized to "pay all Money Orders validly issued by TRUSTEE on said form of Money Order(s), upon presentation to BANK, properly endorsed and otherwise in good form, and shall reconcile such Money Order(s) with the duplicate thereof." (¶5(d))

Paragraph 9 is entitled "Safe Keeping and Liability for Loss" and provides as follows: "Agents shall take such measures to safeguard and protect all Money Orders, supplies, equipment delivered to TRUSTEE pursuant to this agreement and all trust funds as a prudent person would take to safeguard and protect the same as his own property. TRUSTEE shall either cause such property and trust funds to be insured at TRUSTEE's expense against losses from all insurable risks (including . . . burglary, dishonesty, fraud, conversion and mysterious disappearance) or shall be liable for any uninsured loss thereof. . . . In case of any loss of Money Orders . . . TRUSTEE shall notify BANK immediately, giving full particulars of the loss, including, if applicable, the serial numbers of Money Orders lost and the circumstances of the loss."

The final paragraph of the contract is an indemnity agreement whereby the undersigned, in this case Lyle Irwin, General Manager of Kaiperm, agreed to indemnify BANK "against any and all loss, damage, claims, liability or expense resulting from the failure of TRUSTEE to perform or fulfill any obligation to be performed or fulfilled by TRUSTEE by the terms of said Trust Agreement . . . ."

When the contract was signed in 1977, Lloyd Lundquist, manager of Bank's money order division, met with Lyle Irwin and the two discussed the contract in its entirety. Lundquist suggested that Kaiperm safeguard the blank money orders under "double custody." He also recommended that employees of Kaiperm remove from the safe or vault only the amount of money orders they expected to use in one day and that they inventory any unused blanks on a daily basis, by counting them and checking the numbered sequence. He told Irwin that money orders should be treated "just like their cash." Lundquist also went over reporting procedures with Irwin, as set forth in the "Money Order Instruction and Sales Reporting Book" furnished by Bank to Kaiperm.

*The Money Orders.* In December of 1979, after Kaiperm and Bank had amended their contract to include the voucher money orders, Bank employee Tom Aanestad delivered to the main office of Kaiperm five boxes of voucher money order forms, each containing 1,000 forms. The forms looked like this: The name, address, and phone number of Kaiperm appeared in the upper lefthand corner, with Kaiperm's logo. In the upper righthand corner was a nine digit serial number. A box at the top contained the words "Not Good If Issued For Over $40,000." Across the middle of the form were boxes for the insertion of a "sequence control number," "date," "code," and "amount." Directly below this were the words "Pay to the Order of," followed by a blank space. In the lower lefthand corner were printed the words "Payable at Central Bank." Opposite this in the righthand corner was a blank signature line under which appeared the words "void after 30 days."

At the time Aanestad delivered the boxes he furnished Kaiperm with additional copies of the "Money Order Instruction and Sales Reporting Book" which detailed reporting procedures and provided forms for reporting. Among other things, the instruction booklet explained that if any money order duplicates were found to be missing, Bank should be notified immediately.

An instruction sheet was provided with each box of money orders. These were signed by Kaiperm teller and operations officer Becky Brown, who testified that she read through all the instructions at Aanestad's request. The instruction sheet provided that Kaiperm was to deliver to Bank at least every third day a sales report prepared in accordance with procedure described in the instruction book and a check for funds due.

Kaiperm employee Sharon Bruntz, who was at the office when the money orders were delivered, recalled that Aanestad "skimmed over" procedures as far as daily reporting, since reporting was the same as for the smaller money orders Kaiperm had been handling for two years. She remembers he

talked "very briefly" about safeguarding the blank forms; it was her understanding they were to be treated like checks.

In March of 1980, several months after delivery of the money orders, Aanestad and field rep Tom Collins met with Bruntz and Jean Stevens (Steuwer), in order to help Kaiperm reconcile its money orders. According to Collins this meeting stressed security procedures regarding the money orders, in particular the necessity for inventory control.

*The Theft.* Of the five boxes of money orders, one was designated for use by the main office of Kaiperm, and one for each of the four branch offices. The main office was located in an older house which had been converted to commercial use. The boxes of money orders were kept in a closet which was locked at night but often unlocked during the day.

The Alexian Brothers branch of Kaiperm was situated in a construction trailer, which also housed several other functions of Kaiser Hospital. The keys to the trailer were kept in a bag in a file drawer at the main office. Maenya Vlassoff, who worked during this time as manager of the Alexian Brothers branch, testified that she would routinely pick up a batch of money order forms from the main office approximately once a week. She did not note the serial numbers of these, nor did she count exactly how many she took each time. At the branch office the unused money orders were kept overnight in a file cabinet with a lock and bar. The inner door to the office itself did not lock. When Vlassoff issued the money orders to customers she often noticed gaps in the serial number sequence. When she brought this to the attention of the main office she was told not to worry.

Valera Kircher, another employee of Kaiperm during this time, opened the Alexian Brothers branch one day to find the office door unlocked and the money orders lying in an unsecured drawer "like somebody had dropped them like a deck of cards." She called the main office and was told this was "no big deal."

Jean Stevens (Steuwer) worked as a bookkeeper in the main office of Kaiperm. She confirmed that the money orders were not counted when they were released to the branches. No inventory of money orders was ever done as far as she knew. Furthermore the money orders were often used out of sequence at all branches. Employees Sharon Bruntz and Becky Brown also testified that the blank money orders were never inventoried.

Between April and October of 1980 persons unknown helped themselves to money order forms from the numerical sequence assigned to the Alexian Brothers branch, typed in the information on the front and forged the name

of a Kaiperm employee on the signature line. A total of 19 such money orders were paid by Bank in amounts varying from $300 to $20,000. In all Bank paid out $120,980 on the forged money orders.

The first stolen money order was dated April 16, 1980, and was made out in the amount of $800. It was paid by Bank on April 22 and thereafter remained on the prepaid list. The Bank field rep who was responsible for Kaiperm's account, in addition to the accounts of several hundred other agents, was Tom Collins. He testified that he regularly called Kaiperm regarding items on the prepaid list, but he did not remember exactly when or how often he called. It was his custom and practice to call agents about prepaids after 10 days. He remembered that when he did call Kaiperm he was told that the items would be paid, or that the matter would be looked into, and that Bank should prepare and send a bill. He thought that a bill had been sent; the actual billing was done by someone else at Bank. Collins personally visited the Kaiperm office in the last week of July of 1980, at which time at least three of the stolen money orders would have appeared on the prepaid list. At that time he "dropped off" copies of the computer generated prepaid lists and the bills. Following this, Collins was on vacation and then attending various conventions for the next few months. He believed that another employee in the money order division had continued to contact Kaiperm regarding the accumulation of prepaids.

By mid-October the number of prepaids on Kaiperm's list had risen to 19. At this time Bank's Lloyd Lundquist called Gary Kolb, manager of Kaiperm, and brought the matter to his attention. Kolb promised he would "check it out." Bank did not hear from Kolb for several weeks, whereupon Bank closed out the Kaiperm account on November 6, 1980.

Becky Brown, teller at Kaiperm, testified that the first she became aware of any problem was some time in October when Collins came into the Kaiperm office and demanded payment of over $120,000. Sharon Bruntz testified that the first news she had of the outstanding prepaids was by phone from Bank some time in September. Jean Stevens (Steuwer) testified that Kaiperm received prepaid lists from Collins every couple of months, but that these were not checked carefully. She said that Collins himself called regularly or stopped by in person every few weeks. She remembered Collins following up on the first outstanding prepaid for $800 which had appeared in April; she had referred this matter to Becky Brown. Like the other tellers, she did not realize there was any particular problem with outstanding prepaids until demand was made for the large sum of money in October.

On November 7, 1980, the day after Bank closed out Kaiperm's account, Kolb wrote a letter to Bank stating that all 19 money orders had been forged

and asking Bank to return them through banking channels. After receiving declarations of forgery from Kolb, Bank attempted to return the items and was able to recover on 11 out of 19. The remaining eight amount to a loss of $58,850.

## ISSUES

Bank alleges in its breach of contract action that Kaiperm breached fiduciary duties set forth in the contract by 1) failing to safeguard the money order forms, 2) failing to notify Bank of lost or missing forms, and 3) failing to make daily reports and remittance to Bank. In a second cause of action Bank seeks a declaration that it is entitled to indemnification under the contract as against Lyle Irwin and Becky Brown for present losses of $58,850 and for future losses due to claims against Bank by holders of the other 11 money orders.

Kaiperm takes refuge in the commercial code. Kaiperm contends that the money orders were in effect negotiable instruments under section 3104 and that since they were "forged," they were "inoperative" as would be a forged check (§ 3404). Kaiperm argues further that even if the money orders do not fall within the rules of division 3, nonetheless division 4 of the code, which governs "any instrument for the payment of money ... ," applies here. Section 4103, subdivision (1) provides that Bank cannot contractually "disclaim ... responsibility for its own lack of good faith or failure to exercise ordinary care . . . ." A similar provision is contained in section 1102, subdivision (3) of the code.

Failing the protection of the code, Kaiperm attacks the contract itself on theories that 1) Bank didn't comply with certain conditions precedent, 2) Bank was negligent, and 3) the contract was unconscionable. We will turn first to the issues involving the commercial code.

In so doing we note that while the interpretation and applicability of a statute is ultimately a question of law (*Wilson* v. *County of Santa Clara* (1977) 68 Cal.App.3d 78, 84 [137 Cal.Rptr. 78]), certain factual inquiries bear upon that question. To the extent that there are conflicts in the evidence, we accept the factual findings of the court where supported by substantial evidence. (*Estate of Silverstein* (1984) 159 Cal.App.3d 221 [205 Cal.Rptr. 294].)

1. *Are Money Orders Negotiable Instruments Under the Commercial Code?*

This appears to be a matter of first impression in California. Division 3 of the code governs negotiable instruments. We start by setting forth the defi-

nition contained in section 3104: "(1) Any writing to be a negotiable instrument within this division must [¶] (a) Be signed by the maker or drawer; and [¶] (b) Contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this division; and [¶] (c) Be payable on demand or at a definite time; and [¶] (d) Be payable to order or to bearer. [¶] (2) A writing which complies with the requirements of this section is . . . [¶] (b) A 'check' if it is a draft drawn on a bank and payable on demand . . . ."

If a money order is a negotiable instrument, sections 3401, 3404 and 3418 apply. ■ Section 3401, subdivision (1) provides that "[n]o person is liable on an instrument unless his signature appears thereon." Under section 3404, if the negotiable instrument bears an unauthorized signature, that signature is "wholly inoperative." In other words, a forged check does not operate to authorize a bank to debit its depositor's account. If it does so it must assume the loss. (*Basch* v. *Bank of America* (1943) 22 Cal.2d 316 [139 P.2d 1].)

This rule also appears in section 3418 which provides that "payment . . . of any instrument is final in favor of a holder in due course . . . ." Thus a drawee bank which pays a forged instrument cannot recover against any other party in the collection chain who has paid the instrument, including the drawer. (Com. 1 to official text; *Fireman's Fund Ins. Co.* v. *Security Pacific Nat. Bank* (1978) 85 Cal.App.3d 797 [149 Cal.Rptr. 883].)

The justification for such rules, aside from a general policy favoring finality of commercial transactions, is that the drawee bank is in a superior position to detect a forgery because it has the depositor's signature and is expected to know and compare it. (Com. 1 to official text, § 3418.) Therefore the crucial requirement in the section 3104 definition for our purposes is that the writing "[b]e signed by the maker or drawer." ■ Kaiperm maintains that the signature line on the money order was obviously intended for the signature of a Kaiperm employee, without which Bank was not authorized to pay. The evidence however does not bear this out.

Maenya Vlasoff, branch manager, testified that she generally signed the money orders when she issued them. She however acknowledged that she might have sold a few without a signature. It was her understanding that Bank would pay them whether they were signed or not "because it was like cash." Sharon Bruntz's understanding was that a signature was required on every money order issued and that only certain Kaiperm employees were authorized to sign. Jean Stevens (Steuwer), on the other hand, testified that "just about anybody in the credit union" could sign the voucher money orders. She was aware that Kaiperm sometimes sold money orders without

signatures. She believed that Bank did not compare signatures and would pay the money orders whether they were signed or not. In her understanding the employee's signature on the money order was simply for Kaiperm's internal control.

Lloyd Lundquist, manager of Bank's money order division, and James Newman, an expert in the money order banking business, testified that there is no signature requirement on money orders. Banks have no procedure for checking signatures; there is no signature card with which to compare signatures. Money orders are paid no matter who signs them or whether they are signed at all. The only items checked before payment are the serial number and the amount.

Kaiperm makes much of a letter it sent to Bank shortly after the voucher money orders were delivered, which included a list of "authorized signatures" of Kaiperm tellers who would be issuing the money orders. We are not persuaded that this letter is the equivalent of a signature card. In the first place there is no evidence that Bank requested it or even received it. Both Collins and Lundquist denied any knowledge of the letter. Secondly, the evidence showed that the signature list did not include all those who routinely signed the money orders. No attempt was made by Kaiperm to update the list as tellers left and were replaced by others. Therefore, even if Bank did possess a copy of the list, and did use it to compare the signatures, which it did not, the list was fatally inaccurate.

The trial court found that "there was no valid 'signature card' required by [Bank] or between the parties" and further that there was "no necessity for anyone to sign the money orders" at the time of sale. On the basis of these findings, which are supported by the evidence, we conclude that the money orders cannot qualify as negotiable instruments under section 3104.

Kaiperm argues that notwithstanding the definition contained in section 3104, money orders are sufficiently like negotiable instruments to be treated as such. They were in fact "negotiated"; that is they were cashed by the bearer and paid upon presentment to Bank after passing through normal banking collection channels. Kaiperm points out that both Lundquist and the expert Newman testified that money orders are negotiable instruments. While both these gentlemen did refer to money orders as negotiable instruments, it is apparent from a reading of the testimonies that their meaning was that a money order can be "negotiated," in the ordinary sense of the word, by a purchaser who has given cash for it.[2]

---

[2] Upon redirect examination both Newman and Lundquist qualified their earlier references:

The argument can certainly be made, and it is fortified by case authority we summarize below, that in the hands of a purchaser, the money order functions exactly like a negotiable instrument. The purchaser holding the money order has funds "on deposit" with the bank and is entitled to "draw" upon those funds. In this sense the money order is the functional equivalent of a section 3104 negotiable instrument, though it does not precisely fit the code definition.

In the case of *Garden Check Cash. Serv., Inc.* v. *First Nat. City Bank* (1966) 25 App.Div.2d 137 [267 N.Y.S.2d 698], Higgins had purchased a personal money order from defendant bank. The instrument when issued to Higgins bore the bank's name, an encoded serial number and the amount. The payee, the date, and two lines for signature and address remained blank. On the same day that he purchased the money order, Higgins reported to the bank that it had been stolen before he had inserted the payee's name or signed his own. The stolen money order was cashed on that day at Garden Check Cashing Service [plaintiff] by Walker, who filled in his name as payee and signed the instrument. When the money order was presented to the bank for payment, the bank refused payment on the basis of Higgins's stop payment order and returned the money order to plaintiff.

Plaintiff sued the bank contending that the personal money order was akin to a cashier's check upon which the bank would be liable from the moment of issuance with no right to stop payment. Bank argued that the money order was in the nature of a check in that it was an order by the drawer to the bank to pay the stated sum; therefore the purchaser was entitled to stop payment under section 4403.[3]

---

"Q. You earlier told Mr. Lloyd a money order is a negotiable instrument. Is the bank's money order a negotiable instrument?

"A. No. It is not.

"Q. When is the money order or when does the money order voucher become a negotiable instrument?

"A. When the amount is inserted on the money order and when the payee is filled out.

"Q. Earlier you told Mr. Lloyd you thought that a money order was a negotiable instrument. Do you recall that?

"A. Yes.

"Q. You were speaking of a money order that was sold to a purchaser. Am I right?

"A. Correct."

[3]Section 4403: "(1) A customer, . . . or any person authorized to sign checks or make withdrawals thereon may stop payment of any item payable for or drawn against such customer's . . . account . . . . [¶] (3) The bank is liable to its customer for the actual loss incurred by him resulting from the payment of an item contrary to a binding stop payment order . . . ."

In adopting the bank's position, the New York court made the following observations: "The relationship between defendant and the purchaser of the check is reasonably clear. The latter deposited with defendant a sum of money and received therefor a writing in which defendant plainly appeared as drawee. The novel feature of the instrument was that the prospective names of drawer and payee were blank. . . . [¶] We see small difference between the present transaction and one where a person deposits with a bank a sum of money and receives a quantity of blank checks. The obvious difference is that here a single deposit was made and a single blank check received with the amount of the deposit inserted therein. Thereafter the procedure followed the normal and customary pattern—the purchaser filled in the name of a payee, signed his name and address and delivered the instrument. Thereupon it became a negotiable instrument subject to all the rights and provisions of the then Negotiable Instruments Law." (*Garden Check Cash. Ser., Inc.* v. *First Nat. City Bank, supra,* 267 N.Y.S.2d at p. 702.)

Almost identical facts were presented in *Newman* v. *First Nat'l State Bk., Toms River* (1980)173 N.J. Super. 598 [414 A.2d 1367]. Plaintiff Newman had paid on a stolen money order which had been filled in by the thief. Meanwhile the purchaser of the money order discovered the loss and ordered the bank to stop payment. The bank refused payment when the money order was presented. Applying *Garden Check Cash,* the New Jersey court reached the same conclusion, namely that a personal money order, though not defined by the UCC "has the characteristic of a check in that it constitutes 'a draft drawn on a bank and payable on demand.' " (Quoting § 3104, subd. (2)(b).) The purchaser was found to be a customer of the bank and thus was entitled to order the bank to stop payment under section 4403.

The case of *United States* v. *First National Bank of Boston* (D.Mass.1967) 263 F.Supp. 298 concerned stolen and forged postal money orders which had been paid by the government after collection by defendant bank. That case found that the money order is "sufficiently like a negotiable instrument" to bring it within the rule of section 3418: a drawee who pays an instrument on which the signature of the drawer is forged is bound on his acceptance and cannot recover from a collecting bank which gave value without knowledge of the forgery.

These cases clearly support the proposition that money orders and negotiable instruments are indistinguishable once they are placed in the stream of commerce. It follows that code rules which establish the risk of loss between the various parties in the collection process are relevant in such cases. Bank and Kaiperm, however, were not linked in this collection chain. Kaiperm was not a collecting bank, nor was it in any sense a "drawer" of the money orders.

Finally, Kaiperm cites the case of *Thompson* v. *Lake County National Bank* (1975) 47 Ohio App.2d 249 [1 Ohio Ops.3d 313, 353 N.E.2d 895]. In that case a bank paid a stolen and forged money order after the purchaser had ordered the stop payment but before it had been posted at the bank's branch office. As between the bank and the purchaser, the court found that the bank was liable for the loss, even though the purchaser's negligence had contributed to the theft. The reason for this was that the bank had required the purchaser to sign a document entitled "Request for Bank Money Order, Draft, or Official Check" at the time the money order was purchased. The court found this to be evidence that "[h]is signature as drawer was necessary." Accordingly the bank was held to know the signature of its customer and was liable for paying the item over the forgery.

This case too can be easily distinguished from ours in two important particulars: 1) Bank never required a signature from Kaiperm, and thus was in no position to detect a forgery; 2) Kaiperm did not purchase the money orders and was consequently not Bank's customer.

Kaiperm takes exception to this last point, arguing that it took on the status of "customer" when it signed the amendment by which it became authorized to sell voucher money orders as well as personal money orders, the difference being that personal money orders are sold only to others whereas voucher money orders may be purchased by the agent for its own use. The argument runs as follows. If an agent buys a voucher money order from Bank by depositing its own funds in the trust account, it is in exactly the same position as a customer who has purchased a personal money order from Bank "over the counter," and is entitled to the same rights. As discussed above, these rights have been defined by resort to the code provisions governing negotiable instruments. Therefore Kaiperm should be able to rely upon well established code rules regarding payment of forged instruments.

We are not persuaded by this logic. In the first place, even though Kaiperm was authorized to purchase the voucher money orders for its own use, testimony was undisputed that it never did so. The court found that the relationship between Bank and Kaiperm was an agency relationship, as defined by the parties' contract, and that "Kaiperm was not in the position of an ordinary check depositor or bank customer," findings which are supported by the contract itself and by evidence that Kaiperm had no funds on deposit with Bank.

The fact that Kaiperm was authorized to use the voucher money orders to pay its own bills does not, in our view, transform the nature of the parties' relationship; nor by any stretch of imagination does Kaiperm's potential "customer" status operate to bring the money orders within the rules appli-

cable to negotiable instruments. Even if Kaiperm had purchased a money order by depositing funds in the trust account and filling in the face amount, and if that instrument had then been stolen and eventually paid by Bank, Kaiperm would still be precluded from relying upon the forgery sections of the code since Bank had no means of comparing signatures.

In summary, while the cases cited by Kaiperm demonstrate that money orders possess certain characteristics of negotiable instruments, no case has held that a money order which does not require a signature of the drawer is a negotiable instrument under section 3104, and we decline to do so now.

### 2. *Does Division 4 of the Commercial Code Apply?*

Division 4 of the Commercial Code is entitled "Bank Deposits and Collections." It defines the rights and liabilities of a bank and its customer concerning "items" collected and paid through banking channels. An "item" is defined in section 4104, subdivision (g) as: "[A]ny instrument for the payment of money even though it is not negotiable but does not include money . . . ." A "customer" is "any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank . . . ."

■ While it is evident that the definition of item is sufficiently broad to encompass a money order, it is equally plain that Kaiperm was not in a relationship of customer vis-à-vis Bank. As we have emphasized, Kaiperm had no account with Bank. The trust account was with another bank and contained not Kaiperm's funds, but Bank's own funds held in trust by Kaiperm. Nor does the second part of the definition apply, since Bank was not in the business of collecting items for Kaiperm.

Our case therefore differs factually from the two cases offered by Kaiperm. (*Littky & Mallon* v. *Mich. Nat. Bank of Detroit* (1980) 94 Mich.App. 29 [287 N.W.2d 359]; *Columbian Peanut Company* v. *Frosteg* (5th Cir. 1973) 472 F.2d 476.) In those cases the parties had established a relationship of customer and bank by virtue of an agreement to collect, a standing account and a course of dealing.

Section 4103, subdivision (1), on which Kaiperm relies, provides that a bank cannot by agreement disclaim it reponsibility for its own failure to exercise due care. As we have seen, the relationship between Bank and Kaiperm does not fall within the ambit of division 4; therefore this section has no application here.

Since the provisions of the code are not controlling, we move on to issues involving the parties' contract.

### 3. *Did Bank Perform in Accordance With the Contract?*

The claim that Bank did not perform its part of the bargain is based upon the following language in the contract. Under paragraph 5(d) Bank "is authorized to pay all Money Orders validly issued by TRUSTEE, . . . properly endorsed and otherwise in good form, and shall reconcile such Money Order(s) with duplicate thereof." Paragraph 10 says this: "To the extent that there shall be furnished the BANK, duplicates of Money Orders issued by TRUSTEE, reports and good funds, BANK will pay said Money Orders as the same shall be presented to it, properly endorsed and otherwise in good form."

Kaiperm argues that these paragraphs "by necessary negative implication" mean that Bank was not authorized to pay money orders without having received the duplicates, reports and funds, and was not authorized to pay any money orders which were not "validly issued" or "properly endorsed and otherwise in good form."

In reviewing matters involving the interpretation of contracts, where evidence is conflicting we accept the trial court's interpretation if it is reasonable and supported by substantial evidence. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 747 [131 Cal.Rptr. 873, 552 P.2d 1169].)

The court interpreted the two paragraphs quoted above together with paragraph 11 of the contract which says: "Should any Money Order be presented to BANK for payment before remittance may have been received, BANK reserves the right to pay such Money Order upon such confirmation, if any, from TRUSTEE as BANK shall deem advisable." The court found the clear meaning of these provisions to be that "the Bank is to pay the money orders where the duplicate is available and matches the original reconciliation, but where duplicates and funds from the trustee are *not* available at the time of presentment of the money order for payment, the Bank has the right to pay the money order before the remittance is received. Thus the parties agreed that the Bank has retained the option to 'pre-pay' money orders." The court found further that this interpretation was supported by testimony, as summarized in the preceding sections, of the parties' custom and practice over three years. We find nothing in the record or in reason which compels a different interpretation.

Furthermore testimony by the banking expert and by employees of the parties regarding their course of dealing supports the interpretation that a money order validly issued, properly endorsed and otherwise in good form, meant one that bore an authorized serial number, was issued in an amount not exceeding the printed limit and for which no stop payment order had been received.

### 4. *Is the Negligence of Bank, If Any, a Bar to Recovery for Breach of Contract?*

This claim is based upon general rules of liability between a bailor and a bailee. The trial court found that delivery of the money orders to Kaiperm by Bank created a bailment. (See, e.g., *Gillham* v. *Federal Express Money Order, Inc.* (1965) 265 N.C. 322 [144 S.E.2d 557].) While Kaiperm acknowledges that a bailee may by contract undertake an insurer's liability (*Nationwide Check Corporation* v. *Robinson* (Mo.App. 1972) 479 S.W.2d 192), it argues nonetheless that a bailee cannot be bound for a loss caused by the negligence of the bailor, citing the case of *Wilmington Trans. Co.* v. *O'Neil* (1893) 98 Cal. 1 [32 P. 705].

The *Wilmington* case does not stand for this proposition. The loss in that case was the result of an " 'act of God and the elements.' " The bailee was found to be liable since he had contracted to pay for any loss, without qualification as to the manner or cause of such loss. In dicta the court said that the only limitation on a bailee's responsibility in such a case would be if the loss had been caused by "the culpable negligence or other wrongful act" of the bailor.

■ Kaiperm claims Bank was negligent in 1) delivering to Kaiperm 5,000 blank money orders with a potential value of $200 million, without obtaining assurances that Kaiperm understood the risk and had adequate security procedures; 2) routinely paying the items without checking the signature or the paperwork; and 3) not promptly following up by notifying Kaiperm of the accumulation of prepaid items.

The trial court did not find that Bank was negligent. Even had it done so, we are not persuaded that the negligence claimed by Kaiperm amounted to the "culpable negligence" spoken of in the *Wilmington* case, such as to override express contractual provisions fixing liability between the parties.

The court did find that Kaiperm breached its obligation under the contract to exercise care and prudence in the safekeeping of the money orders, and that this breach was the cause of the loss. The contract clearly imposes this obligation upon Kaiperm, and the evidence amply supports a finding of breach.

### 5. *Was the Contract Unconscionable?*

■ As a last point, Kaiperm claims that the contract as interpreted by the court is unconscionable. ■ Unconscionability involves both procedural and substantive elements. In the first place it must be shown that there

has been "an absence of meaningful choice on the part of one of the parties," in addition to which this party must have accepted terms "unreasonably favorable" to the other. (*A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114, 38 A.L.R. 4th 1].)

A determination of unconscionability, though a question of law, involves various factual considerations, including the business conditions under which the contract was formed, the relative bargaining power of the parties, their reasonable expectations, and the commercial reasonableness of the risk allocation as provided in the agreement. (*Ibid.*)

■ The trial court found as follows: "[E]ven though the same contract was 'imposed' on all agents, it represents a reasonable business transaction which specifically places the risk of loss on the one who could best prevent the loss. The risk of loss is placed here directly on the agent. The court received evidence as to the commercial setting, purpose, and effect of the contract and its clauses and finds it clear that there is nothing unconscionable about the contract or the clauses therein. The parties, having agreed on the contract, are bound by it."

This conclusion is fully supported by the evidence. There was testimony that the money order business is highly competitive, that the contract conformed to industry standards, that Kaiperm chose to do business with Bank, and that Kaiperm had access to counsel and was encouraged by Bank to have counsel review the contract at the time of signing. There was evidence that Kaiperm employees were advised regarding the importance of safeguarding the money orders, were instructed about reporting methods, and were aware that money orders would be paid without signatures and before paperwork had been received by Bank.

The risk allocation and indemnity provisions in the contract are not unreasonable or harsh in light of the fact that Kaiperm and its employees were in possession of the money orders and were obviously in a better position than Bank to protect against their loss. The contract provided Kaiperm with a meaningful and commercially reasonable choice: it could "either cause such property . . . to be insured at [its] expense against losses . . . (including . . . burglary, dishonesty, fraud and mysterious disapperance) or . . . be liable for any uninsured loss thereof." As the trial court observed, had Kaiperm simply obtained insurance "this case would never have occurred."

Finally, Kaiperm argues that indemnity clauses are suspect and must be strictly construed against the indemnitee, particularly where, as here, the indemnitee drafted the contract. Even so, evidence here supports the trial court's finding that the indemnity clause is commercially reasonable under

the circumstances. Moreover, the language of the contract fixing liability and providing for indemnity is in no way ambiguous. ■■■ "Once it is determined that there is no ambiguity, the rule of construction against the preparer of the agreement becomes inapplicable." (*Nation-Wide Check Corporation* v. *Robinson, supra,* 479 S.W.2d 192, 194.)

Judgment is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied May 6, 1987, and appellant's petition for review by the Supreme Court was denied July 22, 1987.